## BIGLER *v.* WALLER.

1. Where the terms of a mortgage or deed of trust require that before any foreclosure or sale under it is made, sixty days' notice shall be given in certain newspapers, a sale without the notice conveys no title.

2. Although a mortgagee who takes possession of the mortgaged premises, under what purported to be a sale of the property, may be liable for rents and profits of the estate notwithstanding that the sale was wholly void, yet to be so liable he must have had such a possession as gives an actual enjoyment and pernancy of profits. A false claim of title is of itself insufficient.

3. A mortgagor, who on a bill attempting to charge his mortgagee with reception of profits of the estate because of a foreclosure which, though void for requisite notice of the intended sale in foreclosure, was gone through with in form, has had his bill dismissed, with a decree that *he* is himself still owner and liable for a balance of unpaid mortgage-money, cannot object, on error, that the decree did not order the heirs of the formal purchaser (the purchaser himself being dead) to convey, if the bill have not made such heirs parties, or if they have not been called in

---

[*] 2 Revised Statutes of Kentucky, 126 and 127; The City *v.* Lamson, 9 Wallace, 483.

4. However, the execution of the decree for the payment of the mortgage-money may be stayed in such case till an outstanding title made by the proceedings purporting to have been in foreclosure shall have been brought back to the mortgagor.

5. A decree ordering the payment in coin of a debt contracted before the passage of the Legal Tender Acts reversed on the authority of the *Legal Tender Cases* (12 Wallace, 457).

APPEAL from the Circuit Court for the District of Virginia; the case being thus:

On the 2d April, 1853, Waller, of Virginia, made an agreement in writing with one Bigler, of New York, to sell to him for $30,000 an estate on the York River, Virginia, consisting of about 2400 acres, to be paid for in successive annual payments through a term of ten years. The agreement contained this covenant:

"Said Waller will allow said Bigler to sell such portion of the land as he may see fit, from time to time; the said Bigler paying over to said Waller such proceeds of sales as will afford ample security for the liquidation of the residue of the debt."

On the 10th of May, 1853, Bigler paid $5000 of the purchase-money, gave his bond for the balance, $25,000, took a deed of the property, and at the same time took possession of the estate. On the 22d day of June following, he made a deed of trust or mortgage to one Saunders (like Waller, of Virginia) to secure the payment of the bond. This deed provided for the sale of the estate in default of payment according to the terms of the bond; but it provided also that in case of sale *the trustee shall give sixty days' notice in newspapers in Richmond and in the city of New York.* There was nothing said in either the deed of May 10th to Bigler, nor in the deed of trust to Saunders to secure the purchase-money, of the covenant contained in the agreement of April 2d about Waller's allowing Bigler to sell any portions of the estate.

Bigler having taken possession, as already said, made improvements; wharves, mills, a hotel, store, church, schoolhouse, &c., and laid out a village. In the autumn of 1853 and spring of 1854 he had offers for portions of the estate

(village lots), its most central and valuable part, and applied to Waller to release the mortgage lien; a matter which, in consequence of the opinion expressed by some persons whom he consulted, that the security might be impaired, Waller refused to do. Releases, however, of other and more considerable parts, situated less centrally, were given on the price of them being paid over.

Bigler fulfilled his agreement about annual payments until May 10th, 1861, at which date there remained $13,000 unpaid on the bond, of the original purchase-money. Subsequently to this, the war having now broke out, and Bigler having remained in the North, the rebel army, then in that part of Virginia, took possession of this estate; and about the 1st of March, 1862, Waller caused a sale of the estate to be made at public auction on the premises; the sale being in professed execution of the deed of trust and for non-payment of the debt due on the purchase; *but no notice of any kind having been in newspapers of either Richmond or New York.* Waller bought it in himself for $17,000, and took a deed thereof from the trustee, Saunders, cancelled the bond ($13,000), and gave his notes for the balance of the $17,000 purchase-money. While the rebel army was in possession of the estate a certain Drake, one of its officers, burned two mills and a valuable wharf, and greatly injured the houses and orchards. This destruction occurred a month after Waller's purchase; but Waller was not attached in any way to the rebel Army of the Peninsula, was away at this particular time, and was not shown to have counselled or approved, or even known of what was done. Whether Waller went into actual possession, or whether he had ever been on the estate after the sale, or whether he ever received any of its rents or issues or profits, did not appear, and he denied that he ever was in such possession or ever had received any profits. But it appeared that he had settled with the Confederate government for the waste committed by them while they were in possession thereof, which damage amounted to more than thirty thousand dollars.

Though he sometimes spoke of himself as owner, he fre-

quently declared that he held only to protect the property from seizure and confiscation, as Bigler's, a Northern man's, by the Confederate government; and that when the war closed he should offer the property again to Bigler; he paying the purchase-money.

On the suppression of the rebellion Bigler went to Virginia and resumed possession of his property. He saw its devastated condition and learned of the sale that had been made in professed execution of the trust. On the other hand Waller came North and sued Bigler in one of the New York courts for the balance, $13,000, which was due to him on the outbreak of the rebellion.

Hereupon Bigler filed a bill in equity in the court below. It set out the admitted history of the case as already given; that is to say, the agreement of April 2, 1853, for the sale of the land, the subsequent sale on the 10th of May, the execution of the deed of trust, the possession taken by the complainant, the improvements made, the abandonment of possession in 1861, and its resumption in 1865. It charged that the complainant made contracts for the sale of portions of the land; and tendered to Waller the proceeds of such sales sufficient to afford ample security for the liquidation of the part of the residue of the debt for the purchase-money then due, but that Waller declined to ratify the sales, in disregard of his contract, and greatly to the damage of the complainant; that about September 1, 1861, Waller authorized Saunders, the trustee, to sell the lands; and that a sale was then made to Waller himself, but without such publication as was required by the deed of trust; that out of the proceeds of sale the trustee satisfied the complainant's obligation, and failed to pay over the balance; that Waller then took possession, both of the land and of the personal property thereon, and applied the proceeds of the personalty to the payment of the complainant's debt; that he received large sums for rents of the real estate, and also received compensation from the Confederate authorities for the destruction of the property. The bill further charged the pendency of the suit in New York, and that Saunders, the trustee, was

proceeding again to sell the property without advertising the sale sixty days in newspapers of the city of New York, as required by the deed of trust. It averred also that Waller was insolvent, that he and Saunders would confederate to cheat the complainant in the sale, and that if the sale should be made, the complainant would be unable to recover from Waller what was due to him, or to avail himself in the courts of Virginia of his just rights. The relief prayed was that Saunders, the trustee, might be enjoined against selling the land, and Waller against assigning his interest in the complainant's obligation, until the determination of the action in the State court of New York, or until the matter was referred to a master to take an account of the rents and sales made by him, and an inquiry of the damage done by Waller to the complainant's property; that whatever should be found due the complainant might be decreed to be paid him, and all his proper offsets be allowed. The bill also contained a prayer that all deeds and papers in the defendant's possession concerning the sales be decreed to be delivered up, and concluded with a prayer for general relief.

The answer of Waller denied that he was ever in possession after the deed of trust was made, denied that he sold or appropriated any of the personal property thereon, that he received any of the rents, issues, and profits, or that he committed waste, or induced the Confederate forces to do so.

The suit in New York having been discontinued, and the bill coming on to be heard in the court below on the pleadings and proofs, that court directed a master to state an account between the parties of what was due to Waller on the bond and of the offsets in the nature of waste, rent, and damages due from Waller to Bigler, and to make any recommendations. The master found $13,000 with interest, to be unpaid on the bond; $43,000 with interest, to be due from Waller to Bigler on account of damage, waste, and rent, and concluded with showing a balance of $26,186 due from Waller to Bigler, for which judgment should be entered in favor of Bigler. The report recommended that the bond

be cancelled, and that Waller and Saunders execute a release deed to Bigler of all claims to the land.

During the pendency of the suit (it should be added) Waller died and the bill was revived against his administrator. Saunders also died, and a new trustee, Henry Coalter Cabell, was appointed, with his powers, in his place.

On a final hearing the Circuit Court, overruling the master's report, decided that Waller was not liable for the waste done to the premises, nor entitled to interest on the bond during the war; nor bound to pay damages for not releasing; that Bigler was liable for the amount of the bond, *payable in coin,* and entitled to recover $151.88 (this sum being $2000 Confederate money reduced to the specie equivalent), damages received by Waller of the rebel authorities, for the injury done the estate.

From this decree (which of course assumed that the foreclosure in 1862 was a nullity) Bigler appealed.

*Messrs. E. L. Fancher and J. K. Hayward, for the appellants:*

The court below proceeded on the assumption that Waller's foreclosure in 1862 was a nullity and that the property is now Bigler's. But this is an error. The estate does not belong to Bigler, but belongs to Waller under the foreclosure. Hence the bond has been satisfied by the sale under the trust, and there is even a considerable sum of the purchase-money under the foreclosure still due Bigler, for which Waller is liable.

But if the court will compel Bigler to retake title to the property, then what was Waller's relation to the estate during the interregnum, and what are his responsibilities, if any, growing out of that relation? It cannot be said that Waller's actual relation to the property was not sufficiently intimate to warrant his being said to be in actual possession. He regularly bought it, paid for it, and took a deed thereof. Possession follows the title. In fact he exercised all the acts of dominion over the property possible under the then condition of that portion of the country. Waller could have maintained ouster, eviction, adverse possession, and dis-

seisin, as against Bigler, from April, 1862.  The doctrine of the Federal courts as to what will constitute actual adverse possession is thus stated in Smith's Leading Cases,* and cases there cited; especially in *Robertson* v. *Norris:*†

" It may with safety be said that where acts of ownership have been done upon land which, from their nature, indicate a notorious claim of property in it, &c., such acts are evidence of an ouster of a former owner, and an actual adverse possession against him, if the jury shall think that the property was not susceptible of a more strict or definite possession than had been so taken and held; and the continued claim of property has been evidenced by public acts of ownership, such as he would exercise over property which he claimed in his own right, and would not exercise over property he did not claim."

If the plaintiff is compelled to retake the estate he should have releases from Waller's heirs; for if Bigler pays the bond he is entitled to have a clean record from Waller. Only Waller's heirs-at-law can make this reconveyance, and they were not made parties at the time the administrator was let in to defend.

Finally, in any view, since the reversal in the legal tender cases of *Hepburn* v. *Griswold*, the decree directing the payment in coin must be reversed.

*Mr. Conway Robinson, contra.*

Mr. Justice STRONG delivered the opinion of the court.

The complainant insists that the Circuit Court erred in assuming that the sale which was made by Saunders in 1862 was a nullity, and that the property remained the complainant's notwithstanding.  This position is taken in order that it may be inferred the residue of complainant's bond for the purchase-money was satisfied by a sale under the trust, and that Waller has not only been thus paid, but that he is accountable for the excess of his bid at that sale above the amount then due him by virtue of the bond.  The position

---

* Vol. 2, p. 641, 643, m. 566, sixth Am. ed.　　　† 5 Jurist, N. S. 1238.

is certainly a strange one. It is directly in conflict with the law of the case and with the complainant's bill. By the deed of trust it was stipulated that in case of a sale the trustée should give sixty days' notice in newspapers in Richmond and in the city of New York. To a valid execution of the power of sale such notice was indispensable, and a sale without it of course conveyed no title. It is not pretended that such notice was given. On the contrary, the bill charges that it was not, and to this the answer of Waller makes no denial, while the answer of Saunders expressly admits that there was no advertisement in a New York paper, giving as a reason for the failure thus to advertise that communication with the Northern States was then prohibited. The fact that the sale was made without the requisite notice is then an established fact, and the inevitable inference is that the sale was inoperative to divest the ownership of the complainant. Without confirmation by him it was a mere nullity, disturbing no right and conferring none. But if this were not so, the theory of the complainant's bill is that his title was not divested. It charges that the necessary notice was not given. It complains that possession was taken by Waller after the sale, that he received the rents, issues, and profits, down to 1865, received compensation for injuries done to the improvements by the Confederate military forces, and it asserts that Waller is accountable to the complainant for such possession, rents, and profits, as well as for the compensation he obtained. All this is utterly inconsistent with the assertion that the sale was effectual to change the title. But this is not all. There is much more in the bill that asserts continued ownership of the complainant, and the invalidity of the sale made in 1862. The averment that the trustee is about to sell the lands again under the trust-deed, and the charge that the sale will be conducted in such a partial and unjust manner as to cheat and defraud the complainant are full of meaning. So is the prayer for an injunction against another sale, and the prayer for the delivery over of the deeds. In view of all this it is impossible for the complainant to maintain now that the attempted

foreclosure in 1862 was not a nullity, ineffective to transfer his right to Waller. Even if he could have affirmed the sale, he has precluded himself from doing so, and has left nothing for the court but to adjudicate upon the case as he has made it. There has then been no actual payment of the bond.

The next inquiry is whether Waller is chargeable with the rents, issues, and profits of the property from the 1st of April, 1862, when the sale was made, until the spring of 1865, when the complainant returned to the land and resumed actual possession. This, of course, assumes that the sale had no validity, for if it worked a foreclosure of the complainant's equity, if it vested the title in Waller, there can be no pretence that he is liable for subsequently-accruing rents and profits. It is only while he can be considered as holding the possession in trust for the mortgagor that he can be called to account. Had he entered in pursuance of his purchase, claiming title in himself by virtue thereof, he would doubtless be chargeable as a trustee, though the purchase was wholly void; and it may be conceded, if he had taken actual possession without claim of right, that he might be treated as such. But actual occupation of the mortgaged premises is indispensable to the existence of such a liability. It is the enjoyment of the property, or the pernancy of its profits, that raises the trust. A false claim of title is, of itself, insufficient.

The difficulty of the complainant's case is, there is no proof that Waller was in actual possession, or even that he was on the land at all, from the time of the sale until this bill was filed, or that he ever received any of its rents, issues, or profits. There is a total failure of any such evidence. The most that can be alleged is, that he claimed sometimes to be the owner without ever enjoying any of the rights of ownership. It is proved that he had possession neither of the personalty nor of the realty.

Equally unsustained is the claim, that Waller is responsible for the waste committed upon the land, and the destruction of improvements. The property was greatly injured be-

tween 1861 and 1865, during the existence of the civil war, but the evidence wholly fails to show that the injury was caused by any act of the defendant's. It was done by the Confederate military forces in Waller's absence, and, so far as it appears, without his knowledge.

It is further insisted, on behalf of the complainant, that the Circuit Court erred in refusing to allow him a credit for damages which, it is alleged, he sustained in consequence of a refusal by Waller to release portions of the land from the operation of the deed of trust in order to enable him to sell them. This claim is founded upon the clause in an executory agreement between the parties, dated April 2d, 1853, by which it was stipulated that Waller would allow Bigler to sell such portions of the land as, from time to time, he might see fit, Bigler paying over such proceeds of the sales as would afford ample security for the residue of the debt due for the purchase-money of the land. The deed for the land from Waller to Bigler was, however, not made until the 10th of May, 1853, and probably not delivered until the 22d of June next following, when the deed of trust was executed. Neither the deed nor the deed of trust contains any such stipulation for releases as is contained in the agreement of April 2d, and it might perhaps be maintained that the agreement was subsequently changed, or merged in the after-executed contracts. But, assuming that it was not, what is the evidence of the breach of the agreement? It does appear that, in 1853 or 1854, the complainant had offers to purchase some parts of the land situated in the heart of it; that he applied to Waller for releases, and that they were refused. But it does not clearly appear that those lots thus located could have been sold without so impairing the value of the remainder as to leave it less than ample security for the payment of the residue of the debt. Applications were afterwards made for releases of other and larger portions differently situated, and the releases were given. That those first asked were not given, when only one-sixth of the purchase-money of the whole property had been paid, ought not to be regarded as a violation of the agreement without

very clear evidence that Waller knew they could have been given with entire safety.   Besides, it does not distinctly appear that the complainant was injured by the refusal, or that he ever claimed compensation for it until this bill was filed. From year to year, down to 1860, and including that year, he paid the annual instalments of the purchase-money called for by his contract without claiming any deduction—a course of conduct inconsistent with the existence of any just claim to compensation for a prior breach of his creditor's engagement.   There is, then, no sufficient reason for the allowance of a credit on his bond in consequence of Waller's refusal to execute releases.

It is further objected to the decree of the Circuit Court that it does not direct a conveyance by the heirs of Waller to the complainant.   His heirs were not called in, and they are no parties.   No decree could, therefore, have been made against them; nor was any necessary.   If, by the conveyance of Saunders to Waller in 1862, and his subsequent death, the legal title was cast upon Waller's heirs, it was only a naked legal right, which they may be compelled to surrender whenever the purposes of the trust shall be accomplished—when the debt secured by the deed of trust shall be paid.   Besides, Saunders, the trustee, has also died, and a new trustee has been appointed clothed with all the rights, duties, and responsibilities of the trustee named in the deed.

It is, however, easy to protect the complainant against any outstanding title in the heirs of Waller by staying the execution of any decree until those heirs shall have conveyed to Henry Coalter Cabell, the new trustee, all the interest, if any, conveyed to their father by the deed of Saunders to him, to be held by Cabell under and subject to the trust declared in the deed of trust to Saunders.   Such an order the Circuit Court may properly make.

There remains to be considered but one other objection made to the decree.   It is that the sum found by the account due to the administrator of Waller was decreed to be paid in United States coin.   In view of the ruling of this court

in *Knox* v. *Lee* and *Parker* v. *Davis*,* this was erroneous, and for this cause alone the decree must be reversed.

DECREE REVERSED, and the cause remanded with directions to proceed to an amended decree

IN ACCORDANCE WITH THE FOREGOING OPINION.

---

* Legal Tender Cases, 12 Wallace, 457.