CHICAGO AND VINCENNES RAILROAD COMPANY v. FOSDICK.

SAME v. HUIDEKOPER.

1. A railroad company executed, March 10, 1869, to a trustee, by way of security for its bonds payable thirty years thereafter, a first mortgage upon its road, and stipulated that if "default should be made in the payment of any half-year's interest on any of them, and the coupon for such interest be presented and its payment demanded, and such default continue six months after such demand without the consent of the holder of such coupon or bond, then and thereupon the principal of all of the bonds thereby secured should be and become immediately due and payable, anything in the bonds to the contrary notwithstanding; and the trustee might so declare the same, and notify the company thereof; and, upon the written request of the holders of a majority of the bonds then outstanding, should proceed to collect both principal and interest of all such bonds outstanding by foreclosure and sale of said property, or otherwise, as therein provided." Claiming that there had been a default for more than six months after a demand for the payment of the coupons due in 1873, the trustee declared the principal of the bonds to be due, and notified the company thereof. He then, without obtaining the written request of a majority of the holders of the bonds outstanding, brought suit praying for a decree for a sum equal to the entire amount of the bonds and interest due thereon, and for the

foreclosure and sale of the mortgaged property. *Held,* that, if there had been such default, he was not entitled to the decree.

2. Where by the stipulations of the mortgage it is a security for the payment of the interest as it semi-annually accrues, as well as of the principal, the trustee, on the non-payment of either, or, on his failure to act, any bond-holder, may, to enforce the security, bring suit, and if it results in a sale of the mortgaged premises as an entirety which is confirmed by the court, the purchaser takes an absolute title to them as against the parties to the suit or their privies, and the proceeds of the sale will be applied first to the arrears of interest, then to the mortgage debt, then to the junior incumbrances, according to their respective priority of lien, and the surplus, if any, will be paid to the mortgagor.

3. In such a suit, the decree should declare the fact, nature, and extent of the default which constitutes the breach of the condition of the mortgage, and the amount then due, and a substantial error in that regard will, on appeal, vitiate the subsequent proceedings. A reasonable time for payment should be allowed, and, on such payment within the prescribed period, further proceedings will be suspended until another default occurs. At any time prior to the confirmation of the sale under the decree, the mortgagor, by bringing into court the amount then due, and costs, will be allowed to redeem. *Howell* v. *Western Railroad Company,* 94 U. S. 463, touching the form of the decree where moneys payable by instalments are secured by mortgage, cited and approved.

4. An appeal may lie from a decree in an equity cause, notwithstanding it is merely in execution of a prior decree in the same suit, for the purpose of correcting errors which originate in it; but when such decrees are dependent upon the decree, to execute which they were rendered, they are vacated by its reversal; in which case, the appeal which brings them into review will be dismissed for want of a subject-matter on which to operate.

5. A decree *in personam* for the amount remaining due upon a mortgage debt, after the execution of a decree of foreclosure and sale, is of this description; but, when rendered in favor of other parties than the complainant, it will be reversed for the same error that required the reversal of the decree of foreclosure and sale.

APPEALS from the Circuit Court of the United States for the Northern District of Illinois.

The facts are stated in the opinion of the court.

*Mr. Edwin Walker* and *Mr. R. Biddle Roberts* for the appellants.

*Mr. James D. Campbell* for the appellees.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

These appeals bring into review decrees in the same suit. The bill was filed by Fosdick and Fish, as mortgagees in trust for holders of bonds, for the foreclosure of a mortgage, given by the Chicago, Danville, and Vincennes Railroad Company

upon its railroad, and for a sale of the mortgaged premises. A decree in accordance with the prayer of the bill was rendered, and under it a sale was had and confirmed by the court. From these decrees respectively the present appeals are prosecuted.

The bonds, amounting to $2,500,000 in all, secured by the mortgage in question, were dated March 10, 1869, and payable April 1, 1909, with interest at the rate of seven per cent per annum, payable semi-annually on the first day of April and October of each year, on the delivery of annexed interest warrants in the city of New York, at such place as might be designated by the company, by advertisement published in that city. The mortgage bears even date with them, and, after reciting the resolutions of the board of directors which authorize the issue of the bonds and the execution of the mortgage, conveys to Fosdick and Fish, as trustees, and to their successors and assigns, the road of the company, extending from its terminus, in Chicago, southerly through certain named counties, to Danville, and thence southeasterly to a point on the State line of Indiana, connecting at that point with the Evansville, Terre Haute, and Chicago Railroad, being in length about one hundred and fifty miles, " including all the property between said terminal points, which said party of the first part now has and possesses, or may hereafter acquire," &c.

The conditions and trusts, upon which the conveyance is made, are expressed in a series of articles, nine in number, of which it is important to notice only the following: —

The fifth article provides, in substance, that in case default shall be made in the payment of any interest, or of the principal of any of said bonds, without the consent of the holder, the company shall, within six months thereafter, the same default still continuing, on demand of the trustees, surrender to them possession of the road and mortgaged property; the trustees operating the same shall apply the net profits and income to the payment of the interest so in default until such default shall have been satisfied, when the mortgaged premises shall be surrendered to the mortgagor; but it is provided that no such demand for possession shall be made by the trustees until they shall have been required to take such possession by the holders

of at least one-half of all of the said issue of bonds then unpaid and outstanding.

The sixth article provides further, that in case default shall be made and shall continue as aforesaid, it shall be lawful for the trustees, after entry into possession, taken as above authorized, or other entry, or without entry, to sell and dispose of, to the highest bidder, the mortgaged premises, as an entirety, at public auction, in Chicago, at such time as they may appoint, first having demanded of the mortgagor payment of all money then in default, and having given sixty days' notice of the time and place of sale, by advertisement, as specified; and to convey the same, when sold, to the purchaser, on payment of the purchase-money, in fee-simple, which conveyance, it is declared, shall be a perpetual bar, in law and equity, against the title of the mortgagor, or any other person claiming under it. The net proceeds of such sale are to be applied by the trustees to the payment of the interest on the bonds then outstanding, *pro rata*, until all such interest shall be paid, and afterwards to the payment of the principal; and any surplus, to the mortgagor, — the payments to be made on the bonds, whether the same shall then have become due or not.

By the seventh article it is provided that at any sale of the mortgaged premises, made under the power contained in the deed, or by judicial authority, the trustees may become purchasers of the same in behalf of the bondholders, at a price, in case the sale is of the whole property as an entirety, not exceeding the whole amount of said bonds and interest then outstanding.

The eighth article is as follows: —

"8th. If default be made by the party of the first part in the payment of any half-year's interest on any of said bonds, and the warrant or coupon for such interest shall have been presented, and its payment demanded, and such default shall have continued six months after such demand, without the consent of the holder of such coupon or bond, then and thereupon the principal of all of the said bonds hereby secured shall be and become immediately due and payable, anything in such bonds to the contrary notwithstanding; and the said party of the second part may so declare the same, and notify the party of the first part thereof, and upon the written

request of the holders of a majority of the said bonds then outstanding, shall proceed to collect both principal and interest of all such bonds outstanding, by foreclosure and sale of said property, or otherwise, as herein provided."

It is averred in the amended bill of Fosdick and Fish that all the bonds described in the mortgage had been issued and were outstanding.

It is also alleged that on March 4, 1872, the Chicago, Danville, and Vincennes Railroad Company became consolidated into one corporation, by the same name, with the Rossville and Indiana Railroad Company; and on March 9, 1872, a further consolidation was effected, by the same name, with the Western Railroad Company, an Indiana corporation, whereby the consolidated company was empowered to build and operate a railroad, from the State line in Warren County, to Brazil, in Indiana; and that on March 12, 1872, the consolidated company, to raise means wherewith to construct its Indiana Division, issued its bonds to the amount of $1,500,000, bearing interest at the rate of seven per cent per annum, and payable forty years after date; to secure which, on the same day, it executed a mortgage to Fosdick and Fish, the complainants, covering its Indiana Division, and a branch road extending from a point three miles south from Covington to the village of Newburg, being about eighty miles in all. All the bonds secured by this mortgage were issued.

It is further alleged, that, as further security for both these issues of bonds, the company, on April 24, 1872, executed another mortgage to the complainants, conveying the Indiana Division as security for the first issue of bonds on the Illinois Division, and conveying the Illinois Division as security for the bonds issued originally on the Indiana Division. The company made a subsequent consolidation on May 6, 1872, under the same name, with the Attica and Terre Haute Railroad Company.

The road as built in Illinois extends from Dalton about twenty miles south of Chicago to Danville, about one hundred and eight miles, with a branch from Bismark in Vermilion County to the east line of the State of Illinois, about seven miles. It obtains an entrance into Chicago over the roads of other companies. The company has constructed, in Indiana,

its line from a point where the Bismark branch intersects the State line, a distance of eighteen miles, and has done a large proportion of the work required to carry its road to Brazil.

It is further alleged that the company paid all coupons on both classes of bonds maturing on and prior to April 1, 1873, but that "none of the coupons maturing since that time, or any part thereof, have ever been paid, but the said company, though often requested, has never paid the same, but so to do has made default."

Shortly after the first default on Oct. 1, 1873, to wit, on Nov. 11, 1873, the company issued a circular to the holders of its bonds, proposing to fund the coupons maturing from Oct. 1, 1873, to April 1, 1875, in convertible seven per cent bonds, to be issued for that purpose, the coupons to be deposited with Fosdick, one of the complainants, as a trustee, to be held by him until Oct. 1, 1876, when they were to be cancelled, but in case of non-payment of any coupons becoming due up to Oct. 1, 1876, the coupons deposited with the trustee were to be returned to the original owners, and the second mortgage or convertible bonds surrendered to the company.

In response to this proposition coupons to a considerable amount were deposited with the trustee and convertible bonds received in exchange.

Soon after, on Nov. 20, 1873, another proposition was submitted to the bondholders, to exchange these four coupons for certificates of indebtedness payable in five years from Feb. 1, 1874, with interest payable semi-annually, the coupons to be held by the trustee until after that date, when they were to be cancelled; but in case of non-payment of the interest or principal of the certificates, or of the coupons on the first-mortgage bonds, between Oct. 1, 1875, and Feb. 1, 1879, both inclusive, then the coupons were to be returned by the trustee to their owners, upon surrender of their certificates, with their original rights unimpaired.

It is alleged that the holders of $2,801,000 of both classes of bonds accepted one or the other of these propositions, and deposited their coupons accordingly.

To secure the convertible bonds referred to in the first proposition, a mortgage was executed by the company, of which

James W. Elwell was trustee, to the amount of $1,000,000, payable, with interest semi-annually at the rate of seven per cent per annum, on Feb. 1, 1893, covering the entire line and both divisions of the railroad. It is alleged in the bill that all these bonds, except about $45,000, have been issued.

It is charged that the company failed to pay all the coupons upon the certificates of indebtedness due Feb. 22, 1875, and that it has not paid any that fell due Aug. 1, 1875. It is also charged that the company has never paid any of the coupons upon any of the $4,000,000 of bonds, which were not funded and which matured subsequent to Oct. 1, 1873, amounting to $1,199,000, and that the coupons thereon are overdue and remain unpaid, the owners thereof never having consented to such default; and it is alleged that the company is wholly insolvent.

It is further shown that on June 12, 1875, the railroad company made a further issue of bonds to the amount of $1,000,000, due Jan. 12, 1877, and to secure the same executed a chattel mortgage to R. Biddle Roberts, upon its rolling-stock, engines, cars, tools, and equipment; but it is charged that the same was not executed, acknowledged, and recorded as required by law, and is, therefore, null and void; but that, if valid, it is subject to each of the three mortgages of prior date. About $936,000 of these bonds, it is averred, are held as collateral to debts due by the company, the remainder not having been issued.

It is claimed, also, that by reason of its insolvency the company will not be able to pay the certificates of indebtedness issued by it, or the interest thereon, and that, in consequence of its failure to pay the interest thereon already accrued, the owners of the unpaid coupons of the $4,000,000 of bonds are entitled to rescind the funding arrangement, and to demand and enforce payment of the coupons funded as aforesaid.

It is further alleged that, " by reason of the default of said company in the payment of the coupons due Oct. 1, 1873, and subsequent thereto, which have never been funded, the principal of all of the said bonds has, by the terms and conditions of the mortgage securing the same, become due and payable; and all of the said Illinois Division bonds and of the said Indiana Division bonds were, by the terms and conditions of .

the mortgage securing the same, and in consequence of the defaults aforesaid, due and payable prior to the commencement of this suit. Your orators further allege that, of the said Illinois Division bonds, $698,000 thereof have never been funded by the holders thereof, and the holders thereof have never in any way consented to the continuance of the default in the payment of interest thereon. Your orators allege that they have been requested by the holders of a majority of said Illinois Division, and also by the holders of a large number of the said Indiana bonds, to proceed to collect the principal and interest of said bonds by foreclosure and sale of all of the railroad, franchises, property, and appurtenances of said company within the State of Illinois."

It is also alleged that the Indiana Division of the road is wholly insufficient to secure the payment of the Indiana Division bonds, and that, while the Illinois Division is more than sufficient to secure the payment of the Illinois Division bonds in full, it is not sufficient in addition to pay in full the whole of the Indiana Division bonds.

The original bill was filed Feb. 27, 1875, and made no party defendant except the company. It contained the following averments, which are not found in the amended bill: —

" Your orators further show to your Honors that they have been required by the holders of more than one-half of the twenty-five hundred bonds to demand possession of the said railroad property, franchises, and appurtenances of and from the said railroad company, and have made such demand in pursuance of said requirement, but that said railroad company has not delivered the possession thereof to your orators, but so to do have wholly neglected and refused.

" Your orators further show unto your Honors that they are informed and believe, and therefore charge the fact to be, that at least ninety per cent of the said coupons which matured upon said bonds on the first day of October, 1873, have been duly presented for payment to the said railroad company, and payment thereof demanded from said company, and that the same have never been paid, nor any part thereof; and that the holders of six hundred and ninety-eight of said bonds have never in any way consented to the continuance of said default;

and that, in consequence of the continuance of said default, without the consent of said holders of said six hundred and ninety-eight bonds, the principal and interest of all of the said bonds have become due and payable, and that your orators, as trustees as aforesaid, under and by virtue of the provisions of said mortgage, and the authority therein conferred upon them, have declared the principal of all of said bonds to be due and payable, and have notified the said railroad company thereof."

On May 17, 1875, James W. Elwell, acting trustee in the mortgage of Dec. 16, 1872, appeared and filed a cross-bill, setting out the terms of the mortgage, the issue of the bonds secured thereby, and alleging that, while the interest upon about $160,000 of the bonds had been paid by the company, that upon the remainder was wholly unpaid. The cross-bill proceeds to set out the particulars of the agreements alleged to have been entered into between the railroad company and the holders of its first-mortgage bonds, and continues with the following averments : —

" And your orator therefore avers that said corporation is not in default in the payment of interest upon its said first-mortgage bonds to the amount of one million eight hundred and two thousand dollars, but on the contrary your orator avers that said company has adjusted and settled with the holders of said bonds to the amount as above stated, and received an extension of payment of all such interest coupons now past due and that will mature prior to the first day of October, 1875.

" Your orator states that said corporation has paid to the holders of said certificates of indebtedness all interest coupons attached to said certificates as the same matured, and in accordance with the terms thereof, which had been presented before the appointment of the receiver, as hereinafter stated.

" And your orator represents, upon information and belief, that the holders of the balance of said issue of twenty-five hundred bonds have acquiesced in said extension of payment of interest and excused such default, and have not demanded the payment of their interest coupons nor attempted to enforce the collection of the same.

" And your orator further states that notwithstanding said

agreement of the holders of said first-mortgage bonds to extend the payment of said interest warrants as hereinbefore stated, and the payment of the interest at maturity by said company upon said certificates of indebtedness, yet your orator is informed and believes, and so charges the fact to be, that by reason of divers persons claiming and pretending to be in the interest of a part of said first-mortgage bondholders combining and confederating to wrong and injure your orator and the holders of said second or convertible mortgage bonds and other creditors of said corporation, said company was by the action of the Circuit Court of Will County, in said State of Illinois, on the 22d of February last past, wrongfully and unlawfully dispossessed of all its property so conveyed to your orator by said deed of trust; that all of said property, together with the rights, privileges, and franchises of said company, were on said 22d of February wrongfully and fraudulently taken from the custody and control of said company, and without the knowledge or consent of said corporation, your orator, or of the defendants herein, placed in the charge and under the custody of strangers to said company, and to each of said deeds of trust; that said parties still wrongfully retain the possession of said property and control the revenue and income thereof, thereby preventing said company and your orator from providing funds for the payment of the interest warrants to mature upon the bonds secured by said trust deed so made to your orator, thereby endangering such property and materially depreciating the value of such securities.

" Your orator further states that he is advised and believes, and charges the fact to be, that the property conveyed to the defendants, Fosdick and Fish, by the trust deed so made to them, greatly exceeds in value the amount of bonds so issued under their said deed of trust; and that the net income or revenue derived from a proper and economical use of said property is, and will continue to be, more than sufficient to pay all of the interest warrants as they may become due and payable on all the bonds issued under the said deed of trust.

" And your orator further states, upon information and belief, that certain holders of bonds issued under the deed of trust so made to the defendants, Fosdick and Fish, trustees as aforesaid,

whose names your orator will furnish if required by this honorable court, have resolved and determined to demand and require of them that they shall without delay declare the principal of all of their said bonds presently due and payable, and that they shall prosecute said action to a speedy decree of foreclosure of said trust mortgage, and shall enforce sale of all the property and franchises of said railroad company under said decree, thereby rendering the security of the bonds issued under the deed to your orator utterly valueless.

"And your orator avers that such action will be grossly unjust and inequitable towards the *cestuis que trust* of your orator and other creditors of said company, especially as about eighty per cent of all of said bondholders have extended the payment of their said interest warrants as hereinbefore stated, and waived and excused the default of said company in the payment of said interest.

"And your orator further represents, upon information and belief, that none of the holders of the bonds issued under the said trust deed executed to the defendants, except a very inconsiderable number thereof, have presented to and demanded of said railroad company payment of any of the past-due interest warrants or coupons of said bonds, as required by the eighth article or condition of said trust deed, and, therefore, your orator says that the said trustees, Fosdick and Fish, have no authority under said trust deed to proceed to collect the principal of said bonds by foreclosure and sale or otherwise."

The amended bill of Fosdick and Fish, of which an abstract has already been given, was filed Sept. 14, 1875. Its prayer for relief is that the said Chicago, Danville, and Vincennes Railroad Company, and the said James W. Elwell, whose appearance has already been entered in this cause as parties defendant thereto, may be required to answer this, your orators', amended bill, but without oath, which is hereby expressly waived, and that the said R. Biddle Roberts may be made party defendant hereto, and summoned to answer this, your orators', bill, but without oath, which is hereby expressly waived; and that the receiver heretofore appointed upon the prayer of the original bill in this cause may still hold the said railroad, its equipment and appurtenances, and operate the same under the order and

direction of this honorable court; and that an account be taken of the amount due by the said railroad company upon the said Illinois Division bonds, and upon the said Indiana Division bonds separately, and that the said railroad company be ordered to pay the amount so found due upon said bonds, severally, within a short time, to be limited by this honorable court, and that upon default thereof the said Illinois Division of the said railroad, together with all of the franchises, equipment, and appurtenances thereof, may be sold by the master in chancery of this court, for the payment, first, of the said 2,500 Illinois Division bonds; and, secondly, of the 1,500 Indiana Division bonds, which are the first and second liens upon the said Illinois Division of said railroad, its equipments, franchise, and property, as hereinbefore set forth, or for such other and further relief as to your Honors shall seem meet, and to equity shall appertain.

On Oct. 23, 1875, the Chicago, Danville, and Vincennes Railroad Company filed a demurrer to so much of the amended bill of Fosdick and Fish as charges that it will be impossible for said company to fulfil the conditions of the funding agreements, and that the holders of said certificates have the right to rescind said agreements; and to so much of said amended bill as charges that the principal of said bonds has become due and payable.

On the same day it also filed an answer, containing, among others, the following averments : —

"Said respondent says that on the twenty-second day of February, A. D. 1875, one Stephen Osgood, without any notice whatever to this respondent, upon his *ex parte* application to the judge of the Circuit Court of Will County, in the said State of Illinois, wrongfully and fraudulently procured the appointment of receivers of all the property, assets, and income of the said respondent within the State of Illinois, and that such receivers forcibly took possession of the offices and all the property of said respondent on said twenty-second day of February, and by the aid of writs of assistance and other process issued by said court, or the judge thereof, held the possession of all said property of this respondent, its earnings and income, until the first day of June, 1875, at which time said receivers were removed by the order of this honorable court, and a receiver of

all such property appointed under the prayer of the complainants in the said original bill of complaint contained.

" And this respondent says that on said twenty-second day of February it was not in default in the payment of any of said certificate warrants that matured February 1st, 1875; that all of said warrants were paid as presented to this respondent prior to said twenty-second day of February, and that such balance of $3,167.77 was not paid for the reason that the action of said State court had deprived this respondent of the power to meet such payments. But the said respondent denies that the said corporation was, on said first day of February, 1875, insolvent and unable to meet the payment of said certificate warrants, as charged in said amended bill of complaint, but, on the contrary, avers and charges that at all times after the maturity of said interest, and until said twenty-second day of February, said respondent had the pecuniary ability and was ready and willing to pay all such interest, and did in fact pay all such interest warrants when presented.

"And the said respondent further says and charges the fact to be that the net earnings of said company, during the year 1874, and the months of January, February, April, and May, of the present year, were more than sufficient to pay all the interest accruing upon the bonds issued under the trust deed to the complainants, and also the interest upon said certificates of indebtedness, and upon all other mortgage bonds that had been negotiated and sold by said respondent.

"And the said respondent says that the said company is not in default in the payment of any certificate interest coupons, after proper demand, and that, therefore, none of the holders of said certificates are lawfully entitled to the return from the said Fosdick, special trustee as aforesaid, of the bond interest warrants so funded and deposited with the said Fosdick.

" Your respondent admits that the contracts for funding said interest warrants are substantially set forth in said complainant's amended bill, and that the holders of about four-fifths of the said 4,000 first-mortgage bonds then, and about three-fourths of all now outstanding, entered into said agreement, and so funded their said interest warrants.

" Your respondent further answering, says that it has no knowledge, information, or belief of the number of said bond-holders, under said deeds of trust, that have made demand upon said complainants that they should execute their said trust ; but respondent says that said company is not, and was not at the commencement of this action, in default to one-half of such interest, and, therefore, respondent says that said bondholders had no right to make such demand, and neither were the complainants nor respondent required to accede to such demands, by the terms of said trust deed.

"And the said respondent further answering, says that it has no means of knowledge of the per cent of the holders of said interest warrants that matured October 1st, 1873, that presented such warrants to the company and demanded payment thereof ; but respondent says, if it is true, as charged, that at least ninety per cent made such demand, at least eighty per cent of the entire number afterwards waived such payment, and consented to an extension thereof, as hereinbefore stated, and that as to such eighty per cent said company is in no default whatever.

"And as to the holders of said six hundred and ninety-eight of said bonds who did not fund their interest, the said respondent says, upon information and belief, and so charges, that a large majority thereof have consented to such default in the payment of said interest, and have assented to such extension ; that many of the holders of such bonds have expressed to the officers of said company their assent to such extension, and promised and agreed (but not in writing) that they would in no manner interfere with, or by their adverse action defeat, the plans of said company for the extension of payment of said interest.

" And respondent further says that it has no knowledge that any holder of said bonds ever elected to declare the principal due on account of a default of said company, with the exception of. the said Osgood, who only claimed to hold nine of said bonds.    And as to the said Osgood, the respondent says that, to the best of its knowledge and belief, the said Osgood never has, nor has any one at his request, ever demanded of said company, or of any of its officers or agents, payment of any

of the coupons attached to any of the nine bonds of which he claims to be the owner, and that the only notice the respondent has ever had that the said Osgood had so elected, or that he demanded payment of either principal or interest, was derived from his said bill of complaint filed in said Circuit Court of Will County, as aforesaid, on said twenty-second day of February. And the said respondent further avers that on the twenty-third day of February, 1875, the said defendant offered and tendered the attorney of record of said Osgood, in open court, in said county of Will, full payment, principal and interest, of all the bonds held by the said Osgood, which was refused by said attorney. And that respondent at the same time offered to deposit in court the full amount of said principal and interest, upon condition that said receivers should be discharged, and said property restored to said respondent, which offer was refused."

On Jan. 6, 1876, a petition was filed by Stephen Osgood, who had commenced the original proceeding in the State court on Feb. 22, 1875, and seven others, claiming to be holders of bonds and coupons secured by the mortgages to Fosdick and Fish, in which they recite the previous proceedings in respect to the bill filed by the latter, and allege, among other things, that on Oct. 1, 1873, the railroad company had made default in the payment of interest on its bonds, and that large numbers of coupons maturing on that day were presented at the office of the corporation in the city of New York, payment thereof duly demanded and refused. It also rehearses the funding arrangements, and charges that as they were based on false and fraudulent statements of the company, the owners of the bonds, who funded their coupons, on the faith thereof, are entitled to rescind the agreement and to enforce their claims against the company; that Osgood had never funded his coupons; that demand was made at the office of said corporation in New York, in December, 1874, for the payment of sundry coupons due April 1, 1874, which were never funded or agreed to be so, and that payment thereof was refused; that the said presentment and non-payment were duly evidenced by a public instrument of protest by a notary public in and for said county and city of New York, and that the said coupons still

remain unpaid. More than six months having expired since the demand of payment of said coupons in October, 1873, and the default thereon, and more than six months having also expired since the demand of payment of such coupons in December, 1874, and the default thereupon, the petitioners claim that by the conditions of said conveyances the said principal of all and singular the said bonds has also become due, and that there is now due and owing by the said corporation the full sum of $4,700,000 upon said first-mortgage indebtedness.

The petition prays for an account of the sums due on account of the said bonds, and that the mortgaged property be sold to satisfy the same, &c.

An answer was filed by R. Biddle Roberts, setting up his rights as trustee under the chattel mortgage; and James W. Elwell also answers the amended bill, repeating substantially the allegations of his cross-bill. Fosdick and Fish filed an answer to the cross-bill of Elwell on March 10, 1876, and filed general replications to all the answers to their amended bill. Their answer to the cross-bill contains the following averments : —

" These respondents, further answering, upon information and belief, admit that certain holders of bonds under the deed of trust to these respondents have determined to demand and require of these respondents that they shall without delay declare the principal of all of said bonds presently due and payable, and will insist that these respondents proceed to prosecute their original bill in this behalf to speedy foreclosure and procure the sale of the property and franchises of said railroad company to satisfy said bonds.

" These respondents, further answering, say that they are also informed and believe, and therefore charge the fact to be, that other holders of said bonds are in favor of and propose to demand that no such foreclosure and sale shall be had for the present, but what number of bondholders are in the one class or in the other these respondents are not advised and cannot state, but in that regard they say that they will endeavor to faithfully perform all their duties as trustees in this behalf and submit all such questions as may arise to the determination of this honorable court.

"Further answering, respondents say that they are not advised, and cannot state, what precise number the holders of past-due coupons of bonds issued under the trust deed to these respondents have presented for payment, but they allege that it is immaterial whether one or more of said coupons have been so presented; that inasmuch as the said coupons have not been paid, and a large amount thereof as hereinbefore stated· have long since become due and payable, and these respondents have been by some of the holders of said coupons called upon as trustees to foreclose the said mortgage, they are thereby vested with full authority to proceed to such foreclosure."

An exhibit is filed with the amended bill, being a declaration, signed by Fosdick and Fish, as trustees, which, after reciting the issue of the bonds of March 10, 1869, and the mortgage given to them to secure the payment of the same, and the provision thereof, that the principal should become due, in case of the specified default in the payment of interest, continues as follows : —

" And whereas default has been made by said company in the payment of the half-year's interest on all of said bonds which fell due on the first day of October, A. D. 1873.

" And whereas the coupons for such interest have been presented and payment demanded, and whereas such default has continued for more than six months after such demand, and whereas the holders of said bonds have never consented thereto, and in consequence thereof the principal of all of the said bonds has become due and payable :

" Now, therefore, the said Chicago, Danville, and Vincennes Railroad Company are hereby notified that we, William R. Fosdick and James D. Fish, as trustees as aforesaid, and under and by virtue of the provisions of said trust deed and the authority conferred upon us thereby, do hereby declare the principal of all of said bonds to be due and payable."

Service of this declaration and notice upon the railroad company is acknowledged to have been made Feb. 26, 1875.

Upon the issues thus made by the pleadings, an order of reference was made to a master to take testimony, and report the same with his findings, and a large amount of evidence taken before him is contained in the record.

On June 24, 1876, the master filed his report.' In it, he reported, among other findings, that, on Oct. 1, 1873, the said corporation did not pay any of the interest falling due on that day on the issue of bonds. dated March 10, 1869, or upon the issue dated March 12, 1872; nor has the said corporation paid any of the subsequent instalments on any of said $4,000,000 bonds · falling due at either of the following-named days: April 1, 1874, Oct. 1, 1874, April 1, 1875, Oct. 1, 1875, and April 1, 1876; and that demand was duly made for the payment of divers of such coupons on Oct. 1, 1873, and one of such coupons was protested for such non-payment more than six months prior to the institution of this action, or the written notice of such trustees declaring the principal of such bonds to be due and payable, and there is, consequently, now due to the divers holders of bonds dated March 10, 1869, the sum of $3,505,500. This sum includes the principal of the bonds of the issue of March 10, 1869, the several coupons thereon of the dates mentioned, with interest to July 1, 1876, and the additional sum of $389,500, being twelve and one-half per cent premium on the nominal amount due for payment in gold, according to the stipulation in the bonds and mortgage to that effect.

The master further reported that, as to all matters relating to the funding scheme, referred to in the pleadings, and the effect of the surrender of the funded coupons, and of the failure of the company to pay the coupons due Oct. 1, 1875, he was not required to examine or report upon, and, therefore, made no finding, nor as to any allegations of fraud set up in the pleadings, no testimony having been taken before or submitted to him upon either matter.

The railroad company filed exceptions to this report, of which the sixth is as follows: —

" For that whereas the said master has decided, and in his said report stated, that on the twelfth day of October, 1873, said company did not pay any of its interest falling due on that day; that demand was duly made, and that one of said coupons was duly protested for such non-payment more than. six months prior to the institution of this action, and to the date of the written notice of the trustees, and, therefore, the

said master assumes, and so decides, that the principal and interest of all of said bonds has become due; when the fact is, as shown by the proof offered by the complainants and intervening petitioners, that no coupon was protested until the nineteenth day of December, A. D. 1874, less than three months prior to the date of said notice, and the commencement of this action, and there is no proof that there was ever any other demand upon said company for the payment of said coupons."

On the hearing, a decree was rendered, in which, among other findings, it is declared: —

That the railroad company had paid all the coupons, on the bonds both on the Illinois and Indiana Divisions, which fell due April 1, 1873, and that none of the coupons which had matured since that date had been paid;

That, under the two proposals of the company for funding, there had been deposited coupons due Oct. 1, 1873, to April 1, 1875, inclusive, on all the $2,500,000 of Illinois Division bonds, except $698,500 thereof, which coupons still remained in the hands of Fosdick, as trustee under the agreements; that the semi-annual interest upon the convertible bonds and certificates of indebtedness, issued in exchange therefor, which fell due Aug. 1, 1874, was paid in full, and that the instalment of interest thereon, which became due Feb. 1, 1875, was duly paid by said company upon all of the same which were presented for payment, which was the great bulk thereof, and that no interest has been paid on any part of the same since that time;

That no payment of interest had been made upon the $698,500 of Illinois Division bonds, which had not been funded, since payment of the coupon due April 1, 1873.

The decree then recites as follows: "That heretofore, and on the twenty-sixth day of February, A. D. 1875, the said complainants, as trustees under the said mortgage or trust deed to them, dated March 10th, 1869, did declare the principal of the said twenty-five hundred Illinois Division bonds to be due and payable by reason of the default of said railroad company in the payment of certain of the coupons of said bonds which fell due October 1st, 1873, payment of which had been duly de-

manded, and the continuance of such default for more than six months after such demand."

The decree then proceeds to declare that there is due and owing from the railroad company to the complainants, as trustees under the mortgage deed of March 10, 1869, the several sums of $87,500 in gold coin, for the coupons on the $2,500,000 of bonds secured thereby, falling due respectively semi-annually from Oct. 1, 1873, to Oct. 1, 1876, inclusive, less the payments made on account of the four coupons on the convertible bonds and certificates of indebtedness, with interest on said sums at the rate of six per cent per annum, and, as the decree reads: " In the further sum of two million five hundred thousand dollars in gold coin, for the principal of the said Illinois Division bonds so declared to be due as aforesaid; together with interest thereon from and after the first day of October, A. D. 1876, at the rate of seven per cent per annum in gold."

It was then " ordered, adjudged, and decreed that the said defendant, the Chicago, Danville, and Vincennes Railroad Company, pay, or cause to be paid, to the said complainants as trustees, for the holders of the said Illinois Division bonds and coupons, the said several sums of money, with interest thereon, as hereinbefore found to be due and owing, within twenty (20) days from and after the entry of this decree, and in default thereof, that all of the said railroad, premises, property, and franchises described in the said trust deed, dated March 10th, A. D. 1869, and hereinbefore described as the Illinois Division of said railroad, &c., and all the right, title, interest, and equity of redemption of the said Chicago, Danville, and Vincennes Railroad Company therein, shall be sold as an entirety by Henry W. Bishop, the master in chancery of this court, at public auction, to the highest and best bidder for cash therefor, payable as hereinafter provided, at the west door of the Republic Life Insurance Company Building, in the city of Chicago, in the State of Illinois, after having first given notice of the time and place and terms of sale, and a description of the property to be sold, by advertisement thereof in some public newspaper published in the city of Chicago for the space of thirty days prior to such day of sale."

The decree also contains the usual declaration that a con-

veyance of the title to the property sold, after confirmation of the sale, shall be a perpetual bar, in law and equity, against every claim of the railroad company, or other person claiming under it.

Under this decree a sale was had and reported to the court, and confirmed by a subsequent decree, of the mortgaged property to F. W. Huidekoper, T. W. Shannon, and J. M. Denison, for $1,450,000, and the purchase-money having been paid, $362,500 in cash, and by the surrender of $2,328,000 of the Illinois Division bonds, with the coupons and certificates of indebtedness or convertible bonds thereto attached and belonging, a conveyance of the title to the mortgaged property was made to the purchasers.

It is assigned for error upon the decree of foreclosure and sale, —

*First*, That the court below required from the mortgagor, payment of the principal of the debt secured by the mortgage, as then due, and on non-payment thereof, within twenty days, that the mortgaged property should be sold; and,

*Second*, That it decreed foreclosure and sale on this condition, without proof of the written request of the holders of the majority of the bonds.

It is undeniable that at the date of the filing of the bill, which was Feb. 27, 1875, the defendant, the Chicago, Danville, and Vincennes Railroad Company, was in default for non-payment of the coupons on $698,500 of the issue of $2,500,000 of the Illinois Division bonds, which matured Oct. 1, 1873. The holders of that amount of these bonds did not fund their coupons, and none of them were paid. This failure on the part of the mortgagor constituted a breach of one of the conditions of the mortgage; and continuing for six months, entitled the trustees under the fifth article to take possession of the mortgaged premises, on being so required by the holders of not less than one-half the outstanding bonds, and collect the net income, until the default should have been satisfied; or, to sell the mortgaged premises under the power conferred by the sixth article of the conditions. In the latter event, the mortgaged premises would be sold as an entirety, free from the incumbrance of the mortgage, and the proceeds of the sale applied,

first, to the payment of the amount due and in arrears, and then to the mortgage debt, not then due, and any surplus to the mortgagor. But, inasmuch as by the terms of the first article the conveyance is declared to be for the purpose of securing the payment of the interest as well as the principal of the bonds, and by the fourth article, the mortgagor's right of possession terminates upon a default in the payment of interest as well as principal, on any of the bonds, we are of opinion that, independently of the provisions of the other articles, the trustees, or on their failure to do so, any bondholder, on non-payment of any instalment of interest on any bond, might file a bill for the enforcement of the security, by the foreclosure of the mortgage and sale of the mortgaged property. This right belongs to each bondholder separately, and its exercise is not dependent upon the co-operation or consent of any others, or of the trustees. It is properly and strictly enforceable by, and in the name of, the latter, but, if necessary, may be prosecuted without and even against them. It follows from the nature of the security, and arises upon its face, unless restrained by its terms. And in case the proceeding results finally in a sale of the mortgaged premises, the sale is made free from the equity of redemption of the mortgagor, and all holders of junior incumbrances, if made parties to the suit, and is of the whole premises, when necessary to the payment of the amount due, or when the property is not properly divisible; it conveys a clear and absolute title, as against all parties to the suit, or their privies, and the proceeds of the sale are distributed after payment of the amount due, for non-payment of which the sale was ordered, in satisfaction of the unpaid debt remaining, whether due or not. *Olcott* v. *Bynum*, 17 Wall. 44; *Burrowes* v. *Molloy*, 2 Jo. & Lat. 521. This doctrine is stated by this court in *Howell* v. *Western Railroad Company*, 94 U. S. 463, 466, where an authoritative rule of practice in such cases is prescribed. "We are of opinion, then," say the court, speaking by Mr. Justice Miller, "that there is due from the railroad company to plaintiff the amount of his overdue and unpaid coupons. For this sum, whatever it may be, he has a right to a decree *nisi*, according to the chancery practice, — a decree which will ascertain the sum so due and give the com-

pany a reasonable time to pay it, say ninety days or six months, or until the next term of the court, in the discretion of that court. If this sum is not paid, the court must then order a sale of the mortgaged property, with a foreclosure of all rights subordinate to the mortgage, with directions to bring the purchase-money into court. If the case proceeds thus far, the plaintiff will have a lien on the money thus paid into court, not only for his overdue coupons, but for his principal debt, and it must be provided for in the order distributing the proceeds of the sale. If, however, the company shall pay the sum found due in the decree *nisi*, no further proceeding can be had until another default of interest or of the principal."

The decree *nisi*, mentioned in this extract, like that in a suit against an infant, in which a day is given him to show cause against it, after he attains full age, and like that, where the bill is ordered to be taken *pro confesso*, is preliminary in its nature, requiring a further order to complete it. According to the practice of the English chancery, a decree of this nature in a foreclosure suit, after directing an account to be taken of the principal and interest due to the complainant upon the mortgage, orders, that upon the defendant's paying the amount ascertained and certified or found to be due, within six months, at such time and place as are appointed, the complainant shall reconvey the mortgaged premises; but that in default of such payment, the defendant shall thenceforth be absolutely debarred and foreclosed of his equity of redemption. It is necessary, however, for the complainant, in order to complete his title, to procure a final order confirming it; otherwise the decree of foreclosure will not be pleadable. This order of confirmation is procured on proof to the court of non-payment according to the terms of the decree. 2 Daniell, Ch. Pr. 997.

The time usually allowed by the decree to pay the mortgage debt, whether on a bill to redeem or to foreclose, was six months. But that was not regarded as an absolutely fixed period, but might be varied so as to be reasonable, according to the discretion of the court and the particular circumstances of the case. The courts, however, were very liberal in cases of foreclosure, in extending and enlarging, from time to time, this period of redemption, though not in cases of bills to redeem,

where the mortgagor came into court professing his readiness to pay the amount due, when ascertained, nor in cases of sales, where the mortgagor was not subjected to the severe and absolute forfeiture of his right. *Perine* v. *Dunn*, 4 Johns. (N. Y.) Ch. 140; *Harkins* v. *Forsyth*, 11 Leigh (Va.), 294.

Where, according to the English practice, a sale, instead of foreclosure, was ordered, the form of the decree was the same, directing the sale, in the event of a default being made in payment of the amount found due, within the usual time of six months, or within a shorter period, or even immediately, if by consent, or where it was considered to be for the benefit of all parties. 2 Daniell, Ch. Pr. 1266.

In the early practice in Kentucky, the preliminary decree, finding the amount due and giving day for payment, was interlocutory merely and separate from the subsequent decree, finding the default in not performing the former decree and directing a sale in consequence thereof. *Downing* v. *Palmateer*, 1 Mon. (Ky.) 64; *Oldham* v. *Halley*, 2 J. J. Marsh. (Ky.) 113; *Hanks* v. *Greenwade*, 5 id. 250; *Champlin* v. *Foster*, 7 B. Mon. (Ky.) 104. The ground of this practice seems to have been, that the mortgagor had the right to have the record show that he had failed to pay according to the decree *nisi* before a sale of his property was ordered. But there seems to us to be no sufficient reason why, as it was according to the English practice, and generally in this country, all these matters may not be embraced in a single decree. What is indispensable in such a decree is, that there should be declared the fact, nature, and extent of the default which constituted the breach of the condition of the mortgage, and which justified the complainant in filing his bill to foreclose it, and the amount due on account thereof, which, with any further sums subsequently accruing and having become due, according to the terms of the security, the mortgagor is required to pay, within a reasonable time, to be fixed by the court, and which, if not paid, a sale of the mortgaged premises is directed. *Woodard* v. *Fitzpatrick*, 2 id. 61.

This is that final decree of foreclosure and sale, which determines and fixes the rights of the parties, and from which, on that account, an appeal lies. *Ray* v. *Law*, 3 Cranch, 179;

*Whiting* v. *Bank of the United States*, 13 Pet. 6 ; *Forgay* v. *Conrad*, 6 How. 201 ; *Railroad Company* v. *Swasey*, 23 Wall. 405.

But, as in cases of strict foreclosure, so in cases of sale, the equity of the mortgagor as against the mortgagee is not exhausted until sale actually confirmed; for if at any time prior he should bring into court, for the mortgagee, the amount of the debt, interest and costs, he will be allowed to redeem.

It is the deed made to the purchaser, actually transferring the title of the parties to the suit, that terminates the mortgagor's equity of redemption. *Brine* v. *Insurance Company*, 96 U. S. 627.

It is obvious that the finding of the amount due, for nonpayment of which, according to the terms of the decree, the mortgaged property is ordered to be sold, is the foundation of the right of the mortgagee further to proceed, and a substantial error in that finding must, on appeal, vitiate all subsequent proceedings. Unlike a calculable error in the amount of a personal judgment which may be cured by a *remittitur*, it is otherwise incurable; for, as it is an illegal exaction, made as a condition for preserving the rights of the mortgagor in his estate, and, if executed, depriving him wrongfully of them, it propagates itself through all subsequent stages of the cause. The right to redeem is a favorite equity, and will not be taken away, except upon a strict compliance with the steps necessary to divest it. *Bigler* v. *Waller*, 14 Wall. 297 ; *Shillaber* v. *Robinson*, 97 U. S. 68. In *Clark* v. *Reyburn*, 8 Wall. 318, a decree of strict foreclosure, which contained no finding, either of the fact or amount of the alleged indebtedness, and gave no time within which to pay or redeem, was reversed on these grounds, although the bill was taken *pro confesso* as to the parties having the entire beneficial interest, and contained an averment of the precise amount of the mortgage debt then due. The same consequences undoubtedly would have followed, if it had been a decree of foreclosure and sale, instead of a strict foreclosure; and the error is as vital where a larger amount than is actually due is ordered to be paid, as where there is a failure to find what amount is due.

It becomes, then, of the first importance to ascertain whether

the decree of foreclosure and sale, in the present case, found due and required to be paid, as the condition of exercising the right to redeem, a larger sum than was then due.

The errors alleged in the amount are two. The first is, that there was declared to be payable $252,220, the amount of the several coupons, maturing from Oct. 1, 1873, to April 1, 1875, both inclusive, the payment of which, it is claimed, as to all the bonds of the Illinois Division, except $698,500 thereof, had been, by the funding agreements, extended until Feb. 1, 1879. The second is, that the principal sum of $2,500,000 of these bonds, contrary to the agreement between the parties, was also declared to be due and payable. The appellants insist that the only indebtedness of the railroad company to the bondholders, represented by the complainants at the time of the filing of their bill, was the past-due interest on six hundred and ninety-nine bonds, the interest warrants of which had not been funded, amounting to about the sum of $147,000.

It appears from a statement in the record, admitted to be correct, that there had been deposited and exchanged for convertible bonds the four coupons maturing on and from Oct. 1, 1873, to April 1, 1875, on $271,500 of the Illinois Division bonds, and that by the terms of the agreement under which that exchange was effected, dated Nov. 11, 1873, it was not to be binding unless assented to in writing by a majority in interest of the bondholders. In point of fact, such majority did not assent to it; but under the second proposition, dated Nov. 20, 1873, the four corresponding coupons on $1,530,000 of the bonds, were deposited and exchanged for certificates of indebtedness.

It appears further that the railroad company paid the accruing interest on the convertible bonds and certificates of indebtedness, issued under these arrangements, which became due prior to the filing of the bill, except $3,167.77, which was not presented. The default in respect to the coupons surrendered was, by the terms of the funding agreements, waived as long as the interest upon the securities substituted for them was punctually paid, so that at the date of the filing of the bill there was no subsisting default in the payment of interest, except upon the $698,500 of bonds which had not been funded.

The master finds — and his report in that respect is the predicate of the decree — that divers coupons falling due Oct. 1, 1873, were presented on that day, and that payment thereof was demanded and refused, and that one of such coupons was protested for such non-payment more than six months prior to the institution of the suit, and the written declaration of the trustees, that the principal of the bonds had thereby become due.

There are some statements in the answers, and in the testimony of some of the witnesses, that coupons due Oct. 1, 1873, were presented for payment and were not paid; but there is no proof of the fact as to any particular coupon identified for that purpose, and we have carefully searched the record in vain for any evidence whatever that any coupon, not afterwards funded, was presented and payment thereof refused. The master himself does not report any such. It is entirely consistent with his finding, and with the evidence on which it professes to be founded, that the payment of every coupon falling due Oct. 1, 1873, presented for payment on or after that day, and payment whereof was refused, was extended by the subsequent agreements to fund them. The intervening petition of Osgood and others, if it be considered as a pleading whereby they were allowed to become co-complainants, does not allege that any one of the coupons held by them was presented for payment. It is averred that large numbers of the coupons maturing on Oct. 1, 1873, were presented, and payment thereof was demanded and refused on that day, but the allegation that any such coupon was held by either of the petitioners seems to have been studiously avoided; and stress is laid on averments of fraudulent misrepresentations which induced bondholders to fund their coupons, in support of which the master reported that no testimony was offered, and upon the insolvency of the company, which is entirely immaterial upon the question of an actual default. It is averred in the petition that coupons were presented and payment demanded in December, 1874, which had become due the previous April, and the master so reports as to one; but the only evidence that appears in the record is an admission of the railroad company in its sixth exception to the master's report, where it is accompanied by the statement

that such demand and refusal was less than six months before the filing of the bill, 'and could not, therefore, have been the foundation of the declaration that the principal of the mortgage debt had become payable, which, in fact, was not predicated upon that default, but rested solely on the non-payment of the coupons due Oct. 1, 1873.

There is nothing in the record to show that any one of the bondholders, who had funded his coupons, claimed the right to rescind the funding agreements, or that any step to do so had been taken or authorized.

It is true that after the filing of the bill, and the appointment of a receiver, the company ceased to pay interest upon its securities. That was but the natural consequence of the litigation; and in taking a decree for foreclosure and sale, it might have been in strict accordance with the equitable rights of bondholders who had funded their coupons, to have rescinded the funding agreements, as incapable of execution. But the legal effect of this would have been merely to find as the true amount of the mortgage debt then due, necessary to be paid to avoid a sale, the whole amount of interest unpaid on all the coupons. It would not, however, have put the company in default as to the funded coupons from the beginning, nor deprived it of the benefit of the waiver of that default, arising from the fact of funding. It would have cancelled the arrangement only as and from the date of the decree itself, without impairing its antecedent effect by retroaction. It is true, that where a mortgage has been given to secure a debt payable in instalments, and a bill has been filed for foreclosure and sale, upon a default as to one, the decree may require payment of all instalments then due, though maturing since the institution of the suit; but that principle does not suffice to bring the case of the appellees within the meaning of the eighth article of the conditions of the mortgage, so as to justify the decree requiring payment of the principal of the debt, as presently due. For by the terms of that provision the entire debt does not become absolutely due, on the default of the company, continued for six months, without the consent of the holder, to pay an interest coupon; but only at the election of the trustees, as declared by them and notified to the mortgagor.

And the forfeiture of the time of payment to be established in a given case must stand or fall upon the fact of such declaration and notice, as it may be justified or not by the circumstances existing when they were made. It cannot be supported by subsequent occurrences. It follows, therefore, that the claim in support of the finding that the whole debt had become due must rest exclusively upon the alleged default of Oct. 1, 1873, and that, as we have seen, is not sufficient.

It does not affect this conclusion, that by the terms of the sixth article of the conditions of the mortgage it is provided that upon the exercise of the power thereby conferred, resulting in a sale of the mortgaged premises, for a single default in the payment of interest (it may be one coupon merely), the property is to be sold as an entirety, and free of the incumbrance of the mortgage, so as to pass all the title, both of mortgagor and mortgagee, and that the proceeds of the sale are to be applied, after payment of overdue interest, to the payment of the principal of the debt, though not yet due. This provision does not, either in terms or in effect, make the whole debt due before the stipulated day of payment. It is simply the application to the case of a sale by the trustees under the power, of the practice of courts of equity in cases of judicial sales upon foreclosure. In either case the right of the mortgagee to redeem, and thus prevent the sale, is preserved, on payment, not of the unmatured principal sum of the debt, but merely of the interest then actually due and in arrears, — the very right which, by the decree now in question, was denied. If authority is needed on such a proposition, it will be found in *Holden* v. *Gilbert*, 7 Paige (N. Y.), 208, and *Olcott* v. *Bynum*, 17 Wall. 44.

This right cannot be regarded as other than important and valuable. Its denial in the present case was a substantial and serious wrong. This is manifest from the bare statement that the decree required payment, within twenty days, of $2,500,000, which we find was not due, as a condition of preventing the sale of property, which, it is admitted, was worth more than this debt, and which, according to the testimony in the case, was earning more than enough to pay the current interest on this mortgage. The receiver states the net earnings for the

year 1874 at $330,615.75, and adds, speaking July 31, 1875, that " the present year, like the preceding, is of almost unex- ampled depression in most branches of business upon which the consumption of coal depends," the transportation of which was the main traffic of the road; and adds that he believes, on the reasons he states, that " it is practicable, in a year of fair prosperity, to increase the earnings from fifty to eighty per cent over those of 1874." Upon such a showing, it is immaterial to say that the railroad company was commercially insolvent, not being able to pay all its obligations as they matured; for the fact, if admitted, would not affect its legal or equitable rights, much less be allowed to deprive its other creditors, junior incumbrancers and lienholders, of their right to prevent a sale and sacrifice of the property by paying the comparatively small amount of the interest, justly due, upon the first-mortgage bonds, and thus preserving their own estates and interests as well as those of the mortgagor.

The second assignment of error which we have noted is, in our opinion, also well-founded.

The eighth article of the conditions of the mortgage, which relates to this subject, contains the provision that, after the principal of the bonds has been declared by the trustees to have become due, by reason of the default therein described, and the mortgagor notified thereof, the trustees, " upon the written request of the holders of a majority of the said bonds then outstanding, shall proceed to collect both principal and interest of all such bonds outstanding, by foreclosure and sale of said property, or otherwise, as herein provided."

It is contended on behalf of the appellees, that without the last clause the trustees have the sole right to act, according to their discretion and upon their own motion, in declaring the principal sum due on account of the default; and that upon such declaration and notice by the trustees the whole sum becomes due irrevocably for all the purposes of the mortgage; so that thereafter the trustees, at their option, may file a bill for foreclosure and sale, or may intervene, in case such a bill is filed by any bondholder, and thereupon the amount decreed must be the amount thus declared to be, and hence, actually due; and that the office of the clause in reference to the

written request of a majority of the bondholders is merely to make the obligation of the trustees imperative, instead of optional.

We cannot agree to that construction of the provision. The whole article must be taken together. It is, in fact, a unit, and is directed to a single end. And the nature of the provision and the character of its object must be taken into consideration as furnishing the rule of its interpretation. It is an agreement which the parties were at liberty to make. There is nothing in it illegal or contrary to public policy. And while it is in the nature of a forfeiture, it is one against which, when it has taken place according to the fair meaning of the parties, courts of equity will not relieve. It was so held in *Noyes* v. *Clark*, 7 Paige (N. Y.), 179; *Noonan* v. *Lee*, 2 Black, 499; *Olcott* v. *Bynum*, 17 Wall. 44.

The stipulation, nevertheless, is in the nature of a penalty, and may be regarded as *stricti juris*, to be construed fairly and reasonably, according to the meaning of the parties, but leaning, if need be, in any case of ambiguity, in favor of the debtor. And the construction, in the present instance at least, which favors him, does not discriminate against the bondholders as a class, but rather between the interests of the whole number, represented by the trustees and controlled by a majority, and those of a single creditor, or a minority, associated in the like case, pursuing their remedy as individuals. For while, as we have seen, one or any number of bondholders may prosecute a bill to foreclose the mortgage, upon default as to payment of a single coupon, or the trustees may intervene on behalf of all for the same purpose, because the failure to pay a single instalment of interest is made a breach of the condition of the mortgage; yet it is apparent that one purpose at least of the clause in question was to protect the bondholders as a class against the views of individuals and combinations of individuals, being a minority, pursuing separate interests.

In declaring the principal sum due before the date fixed by the credit, upon a default in the payment of interest, the trustee is acting for the whole number of bondholders, and the provision that subjects his action in enforcing the stipulation

to the wishes of a majority is meant, as we think, for the protection of the class. Many cases may be mentioned to illustrate the importance in their interests of such a control, rather than to put it in the power of one or a minority to require all to accept what the majority might consider to be a premature and less valuable satisfaction for their existing security. The larger number might think it to their advantage even to defer the collection of their overdue interest, much less not to anticipate the payment of the principal, even when the security was ample to meet both; for they might esteem the ultimate investment higher than present payment. While they could not and ought not to prevent others, even a single individual, from exacting the promptest payment of what is due and may be important as current income, by legal process, they may nevertheless rightfully object to an anticipation of payment that may, in their opinion, prove to be a sacrifice. And this becomes especially important when the present value of the security is insufficient to prepay the incumbrance, but contains the solid promise of future indemnity as an investment. It is that interest we think, that dictated the clause in question, and can be satisfied only by the construction which secures to the majority of the bondholders the right to veto the proceeding of the trustees.

Indeed, the other construction contended for, which gives to the majority only the right to make the obligation of the trustees to proceed, imperative, renders it nugatory. For upon that supposition, the debt having become fully due, by the declaration and notice of the trustees, for all the purposes of the mortgage, if they should delay or refuse to file a bill for foreclosure and sale, it would still be in the power of a single bondholder to proceed for himself and associates directly for the same object, and to procure the same relief.

It is therefore our opinion that, even had the trustees rightfully declared the principal sum of the mortgage debt due, and given the proper notice thereof, nevertheless, the foundation for proceeding to foreclose for that cause, and of the decree requiring payment of that amount, would fail, without proof that the bill had been filed for that purpose, upon the written request of the holders of a majority of the bonds then out-

standing. . It is not disputed that no such proof is to be found in this record.

Other errors than those already discussed have been assigned upon both appeals, which, as in the further progress of the cause they may not arise again, we have not considered and do not therefore pass upon.

For the reasons already given, both decrees will be reversed, and the cause remanded with instructions to proceed in conformity with this opinion.

*So ordered.*

Mr. Chief Justice Waite, with whom concurred Mr. Justice Harlan, dissenting.

I am unable to agree to the judgment in this case. In my opinion default had been made in the payment of the interest on some of the bonds, within the meaning of the eighth clause of the mortgage. The company having given notice that the coupons due Oct. 1, 1873, would not be paid if presented, no presentation was necessary in order to create the default. This notice was a waiver of. a presentation in form. Coupon-holders were in effect told it was useless to make a demand, because if made it would not be met. Confessedly this default as to the coupons on $698,000 of the bonds continued more than six months. Holders of bonds to this amount declined to enter into the scheme for extension. They kept their coupons, hoping some plan might be devised for payment, but retaining all their rights under the mortgage, if their hopes were not realized.

This default having happened, and having continued more than six months without the consent of the holders of the coupons, by the express terms of the eighth clause, the principal of all the bonds secured by the mortgage became immediately due and payable. If after that the holders of a majority of the outstanding bonds had requested the trustees in writing to foreclose the mortgage, it would have become the imperative duty of the trustees to institute the necessary proceedings for that purpose. But if no such request was made, it seems to me that the trustees were not precluded from commencing such proceedings on their own motion, in case the safety of the trust

made it necessary. It is possible, if a majority of the bond-holders had, in an appropriate way, interfered to prevent the trustees from going on, some relief might have been afforded them; but when all came in and availed themselves of what had been done, the corporation was in no position to defend, because a request had not been formally made in advance. As to the corporation, the principal of the bonds became due and payable when a default occurred which continued the requisite length of time. Whether a foreclosure should be had because of the default, rested alone with the bondholders and trustees. The provision in the mortgage for the written request was, as it seems to me, not for the protection of the company, but the bondholders. If the bondholders are satisfied with what the trustees have done, the corporation is in no condition to complain.

That the trustees were justified in commencing proceedings on their own motions seems to me clear. Some of the bond-holders, having coupons and bonds, as to which default had been made, began a suit for foreclosure in a state court, and secured the appointment of a receiver. The company was very much embarrassed financially, and, so long as the receivership continued, could do nothing to extricate itself from its diffi-culties. It was a necessity, therefore, for the trustees to inter-fere. When they did, the company did not relieve itself from the consequences of its default in the payment of coupons on the $698,000 of bonds. All the bondholders seem to have been satisfied with what was done, and they united with the trustees in pressing the foreclosure.

Under these circumstances, in my opinion, the court properly treated the principal of all the bonds as due, and decreed accordingly.

These cases were decided at the last term, before the appoint-ment of MR. JUSTICE GRAY and MR. JUSTICE BLATCHFORD. A petition for a rehearing in the second case was then filed. They took no part in the subsequent action of the court.

MR. JUSTICE MATTHEWS delivered the opinion of the court. Since the announcement of our former opinion, the appellees, having filed a petition for rehearing, have suggested that the

decree brought up by the appeal in the second case is not, what it is recited to be, in the prayer for appeal in the Circuit Court, — viz. the decree confirming the sale of the mortgaged property under that of foreclosure and sale,—but one rendered subsequently thereto, and merely in execution of it, and that it is, therefore, not the subject of an appeal, and claim that the present appeal should be dismissed for want of jurisdiction.

The appeal prayed for and allowed in the Circuit Court is recited in the petition therefor filed March 26, 1879, to be as follows: —

"From the decree entered April 12, 1877, confirming the report of the sale of the property of the defendant railroad company.

"From the decree of April 16, 1877, ordering the delivery of the deed and possession of the property to the purchasers, Frederick W. Huidekoper, Thomas W. Shannon, and John M. Dennison.

"From the decree entered in said cause on the nineteenth day of November, 1877, in favor of Frederick W. Huidekoper, Thomas W. Shannon, and John M. Dennison, and against the said Chicago, Danville, and Vincennes Railroad Company, for the sum of $1,808,646.46."

The two decrees last named, of April 16, 1877, and of Nov. 19, 1877, do not appear in the record.

An examination of the terms of the decree of April 12, 1877, shows that it is a decree, confirming the report of the master, upon a petition of the purchasers, Huidekoper, Shannon, and Dennison, asking that their bid may be satisfied by a surrender of bonds and coupons without further cash payment, and, upon that surrender, for a conveyance of the title to the property, and to be let into possession. What prior action of the court, upon a report of the sale, had taken place, the transcript of the record before us does not disclose. Counsel for the appellees state that there was in fact a prior decree, confirming the sale, rendered on Feb. 26, 1877, from which no appeal was perfected, and produce in support of their statement what is called a supplemental transcript of the record, containing such a decree. This, however, we cannot at present consider or act upon, further than to say that, in view of the

suggestions made, and to enable the parties to present whatever questions arise upon the record as it is now before us, or upon a complete record, when supplied, upon the appeal prayed for and perfected on March 26, 1879, the application for a rehearing is granted; and the decree of this court rendered at the present term, so far only as it reverses any of the decrees embraced in this appeal, is to that extent and for that purpose set aside.

At the present term the case was argued by *Mr. Edwin Walker* and *Mr. R. Biddle Roberts* for the appellants, and by *Mr. Henry Crawford*, *Mr. Charles B. Lawrence*, and *Mr. Melville W. Fuller* for the appellees.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

This appeal, heard during the last term with that from the decree of foreclosure and sale in the same case, was taken from three decrees rendered after the sale had taken place.    Huidekoper, Shannon, and Dennison, the purchasers of the mortgaged property sold under the decree of foreclosure, who are appellees in this appeal, were not parties to the former appeal. All the decrees appealed from, including those now in question, were included in the order of reversal made at the former hearing; but on a petition for rehearing, it was called to the attention of the court that the transcript of the record was imperfect and incomplete, the decree confirming the sale having been omitted, and that the petition for the present appeal contained a misrecital, that the decree entered April 12, 1877, was the decree "confirming the report of the sale of the property of the defendant railroad company." The order of reversal was, therefore, set aside as to the decrees embraced in the present appeal, and a rehearing granted. The cause, on that rehearing, has now been heard at the present term upon the whole record, as amended and perfected.

From that it now appears that on Feb. 17, 1877, the master filed his report of the sale, and the purchasers, their petition for its confirmation, and for other relief; and it was on that day, on motion of the complainants' solicitors, ordered that the

report and sale be confirmed, unless objections thereto should be filed on or before the Friday next following, for which day it was set for hearing. And exceptions having been in the mean time filed by one Slaughter, on Feb. 26, 1877, the court over-ruled the exceptions, and as the order reads, "does in all things confirm the sale" to the purchasers. From this decree an appeal was prayed by Slaughter, but was not perfected or prosecuted. The petition of the purchasers, filed Feb. 17, 1877, in which they also asked for the immediate discharge and payment of their bid, had been referred to the master, whose report subsequently filed was confirmed by the decretal order of April 12, 1877, by which he was directed, on the surrender to him of two thousand three hundred and twenty-eight first-mortgage Illinois Division bonds of the defendant railroad company, to execute and deliver to the purchasers a deed of the property sold, and thereupon the receiver was directed to let them into possession. On April 16, 1877, the master having reported the execution of the decree of April 12 by the delivery of the deed and the acceptance of the bonds, a further decree was entered approving and confirming the same. These are the two decrees first named in the prayer for the present appeal.

It is now contended by the appellees that these decrees are merely orders in execution of the previous decrees of the court; are, therefore, not final in the sense necessary to authorize an appeal; and that consequently, as to them, the present appeal must be dismissed for want of jurisdiction.

But according to the rule sanctioned and adopted in *Forgay* v. *Conrad*, 6 How. 201, and *Blossom* v. *Railroad Company*, 1 Wall. 655, an appeal will lie from such decrees, according to the nature of their subject-matter and the rights of the parties affected.

In the present case the decree of April 12, 1877, in effect, distributes the proceeds of the sale upon the basis of the finding and declaration in the decree for foreclosure, that the principal of the bonds had become overdue; for it authorized the purchasers, to the extent of the proportion in which the bid, if treated as cash, would, when applied, extinguish the bonds held by them to use their bonds as cash in payment of their bid. It is manifest that a substantial error, to the prejudice of one

of the parties, may originate in a decree distributing the proceeds of a sale under a decree of foreclosure ; and no question can be successfully raised against the right to appeal from such a decree. We cannot, therefore, dismiss the present appeal upon the ground alleged.

It is then urged by the appellees that the decrees in question, having simply followed the directions of previous decrees, originated no error, and that the only alternative is to affirm them. But the decrees involved in this appeal now under consideration are dependent upon the decree of foreclosure and sale ; and the latter having been reversed, the decrees in question are left without support, and fall of themselves, by reason of that reversal, vitiated ·by the common error. As they are already annulled by operation of law, the subject-matter of the appeal is withdrawn, and the appeal itself must be dismissed for lack of anything on which it can operate.

The other decree involved in this appeal was entered Nov. 19, 1877, and is a personal judgment in favor of Huidekoper, Shannon, and Dennison, as trustees for themselves and other bondholders, for the deficiency arising from the excess of the amount found due by the decree of foreclosure and sale over the credit, given of the proceeds of the sale of the mortgaged property. This deficiency is ascertained to be $1,823,573.84, and execution is awarded therefor, against the railroad company, in favor of the above-named parties.

It would seem that the reasons given for dismissing the appeal as to the other decrees apply with equal force to the one now under consideration ; and such, we think, would be the rule in ordinary cases ; for the existence and amount of the deficiency must usually be dependent on the findings of the decree of foreclosure and sale, as to the amount due, and the extent to which that may have been reduced by the proceeds of the sale. But the present judgment is not in the customary form. Instead of finding the amount due to the complainants in whose behalf the sale was decreed, the judgment is rendered in favor of Huidekoper, Shannon, and Dennison, as trustees for the bondholders. They claim not to have been parties to the suit at the time the decree of foreclosure and sale was rendered ; and, as we do not consider it proper to investigate or pass upon

that claim in the present proceeding, we entertain the appeal. as to the deficiency decree, and reverse it, for the error which required the reversal of the decree of foreclosure and sale.

The argument of the present appeal, on both sides, seems to have been influenced by the consideration that it possibly involved a present adjudication of the effect its determination might have upon the rights of the purchasers at the sale and the present title of the property sold. But no question of that character is involved. Whether the purchasers were parties to the litigation, either by name upon the record or in interest and by representation, so as to be affected by the error in the proceeding for which the decrees have been reversed, or whether they or their assigns are protected by the principle and policy that uphold the titles of *bona fide* purchasers without notice, at judicial sales, and any other that may be mooted touching the point, are questions which do not arise upon the present appeal, and are left for further consideration in case they should be presented in a subsequent stage of this or by virtue of proceedings in some other suit.

For the reasons announced, it is, therefore, ordered that the appeal from the decrees of April 12, 1877, and of April 16, 1877, respectively, be dismissed, upon the ground that the decrees were vacated by the reversal of the prior decree of foreclosure and sale, rendered Dec. 5, 1876, and that the decree entered Nov. 19, 1877, in favor of Frederick W. Huidekoper, Thomas W. Shannon, and John M. Dennison, trustees, be reversed, and that the cause be remanded with directions to proceed therein as may be just and equitable.

The appellants are entitled to their costs on this appeal.