## SEATTLE, L. S. & E. RY. CO. v. UNION TRUST CO.

(Circuit Court of Appeals, Ninth Circuit. February 8, 1897.)

1. FORECLOSURE OF MORTGAGE—PLEADING—DEFAULT IN INTEREST—PRINCIPAL DECLARED DUE.

When a suit for the foreclosure of a mortgage has been commenced, based upon a default in interest alone, and, while the suit is pending, the trustee of the mortgage, under the provisions thereof, elects to declare the principal of the bonds secured by it due because of the nonpayment of interest, such election is properly the subject of a supplemental bill, but, if introduced into the suit by amendment to the original bill, objection must be made by demurrer, plea, or answer; otherwise it is waived.

2. SUBPŒNA—AMENDED BILL—STIPULATION TO ANSWER.

The sole office of the writ of subpœna is to bring a defendant into court, in order that the court may acquire jurisdiction of his person; and, when a defendant has appeared generally in a cause, and subsequently, upon the filing of an amended bill containing a new cause of action, stipulates by his solicitor to file an answer to the merits of such amended bill, no subpœna thereon is required.

3. MORTGAGE FORECLOSURES—PLEADING—DEFICIENCY DECREE.

A decree for a deficiency upon the foreclosure of a mortgage, may be rendered, under the ninety-second equity rule, without a special prayer therefor in the bill, though it is the better practice to insert such a prayer.

4. SAME—STIPULATION AS TO PROPERTY COVERED.

When, in a suit for the foreclosure of a mortgage, the parties have stipulated that certain property is covered by the mortgage, no objection can afterwards be made to its inclusion in the decree of foreclosure which could have been obviated by the introduction of any proof.

Appeal from the Circuit Court of the United States for the Northern Division of the District of Washington.

Crowley & Grosscup, for appellant.

E. C. Hughes, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. This was a suit for the foreclosure of a mortgage, executed August 10, 1886, by the appellant, Seattle, Lake Shore & Eastern Railway Company, to the appellee, Union Trust Company of New York, in trust, to secure the payment of 5,675 bonds, of the denomination of $1,000 each, payable to the holder or holders thereof on the 1st day of August, 1931, with interest thereon at the rate of 6 per cent. per annum, payable semiannually. The bonds had annexed thereto interest coupons for the respective semiannual installments of interest. After the delivery of the bonds, and before the institution of the suit, 117 of the bonds were redeemed and canceled by the railway company, leaving 5,558 outstanding at the time of the commencement of the suit, in the hands of the various parties to whom they had been sold for a valuable consideration. Each of the bonds contains this provision:

"The payment of the principal and interest of this bond, with others of like tenor and same date, not exceeding, in all, twenty-five thousand dollars per mile of railroad and branches authorized by the articles of incorporation or charter of the company, is secured by a mortgage or deed of trust duly made by the said railway company to the Union Trust Company of New York, trus-

tee for the holders of all said bonds, which shall be the first mortgage and paramount lien upon the entire of said lines of railroad and branches, constructed or to be constructed, with the appurtenances, rights, and branches, and upon all the property and rights of property of the said railroad company now held and which may be acquired."

To secure the payment of the bonds, all of which were duly authorized and executed by the railway company, the company at the same time duly executed to the trust company a mortgage upon its property, in which the property mortgaged is thus described:

"All and singular the said lines of railroads and branches of the said party of the first part now being and to be constructed in the territory of Washington, and hereafter to be constructed in the territories of Idaho, Montana, and Dakota, and extending from a point on Puget Sound at the city of Seattle, King county, Washington territory, to a point on the eastern boundary line of said last-named territory in the vicinity of Lewiston, in Idaho territory, and thence in a general easterly direction, through the territories of Idaho, Montana, and Dakota, to a point at or near Deadwood, in said Dakota territory; and also a line of railroad from a point on said above-described line east of the Cascade Mountains to the city of Spokane Falls, and thence to some point on the eastern boundary line of said Washington territory; and also such branch railroads, from such convenient points on said above-described lines of railroad, to such points, either north or south of said lines of railroad, as said railway company may hereafter determine; and all the lands, tenements, and hereditaments acquired or appropriated, or which may or shall hereafter be acquired or appropriated, for the purpose of a right of way for said lines of railroad and branches; and all the easements, rights, liberties, franchises, privileges, immunities, and exemptions of the said party of the first part appertaining to the construction, maintaining, operating, owning, and enjoying of said lines of railroad and branches, and every part thereof; and all railroad tracks, railways, ways, and rights of way, depot grounds, bridges, viaducts, culverts, fences, and other structures, depots, station grounds, station houses, engine houses, car houses, fuel houses, ware houses, shops, machine houses, water tanks, turntables, superstructure, erections, fixtures, rolling stock, furniture, tools, implements, appendages, and appurtenances, used or intended to be used in connection with said lines of railroad and branches in any manner whatsoever; and all and singular the tenements, hereditaments, appendages, and appurtenances thereunto belonging, whether now owned or acquired, or hereafter at any time to be owned or acquired, by the said party of the first part, together with all and singular the rents, tolls, income, issues, and profits of the said lines of railroad and branches, premises and property; and also all the estate, right, title, interest, property, claim, and demand whatsoever, as well in law as in equity, and present and prospective, of the said party of the first part in and to the same and every part thereof."

The mortgage also provided that the railway company should pay into a sinking fund, created by the terms of the mortgage, annually, after August 1, 1891, an amount equal to 1 per cent. upon the aggregate of the principal of all of the company's outstanding bonds. It also contained a covenant to the effect that the railway company, whenever requested by the trust company, should execute to the trust company such further deed and assurance for the better assuring to the trustee the said lines of railroad and branches, premises, property, appurtenances, rights, privileges, immunities, and franchises mentioned, and thereby "conveyed, or meant or intended so to be, whether now owned, acquired, or held, or hereafter to be acquired or possessed by it," as the trustee or its counsel should reasonably advise or require. The mortgage also contained this covenant:

"In case default shall be made at any time in the payment of any installment of interest on any of the bonds hereby secured, the payment thereof having

been duly demanded, and the coupons therefor having been duly presented at the time and place named therefor, and if any such default shall continue for the period of six months, then and in such case the principal of all said bonds shall, at the election of the trustee, become and be immediately due or payable, anything in the said bond or herein contained to the contrary notwithstanding; but a majority in interest of the holders of all said bonds then outstanding, unpaid or unredeemed, may in writing instruct the trustee in any such case to declare the said principal to be due, or to waive the right so to declare, on such terms and conditions as such majority shall deem proper, and may annul or reverse the election of the trustee; provided, that no waiver by the trustee or the bondholders shall extend to or be taken to affect any case of subsequent default, or to impair the rights resulting therefrom."

The record shows that in July, 1893, in anticipation of default in the payment of the interest upon the bonds maturing August 1, 1893, an agreement was prepared providing for the appointment of a committee of the bondholders, to consist of James D. Smith, H. O. Armour, Edward D. Christian, Morton S. Paton, and a fifth person to be chosen by them, authorizing such committee to institute and conduct such suits and actions and take such proceedings as to it should seem advisable and proper for the protection and enforcement of the rights of the bondholders, of which committee Morton S. Paton was selected chairman. Subsequently that agreement was signed by the owners and holders of 4,672 of the bonds, being more than five-sixths of the entire issue. On the 16th day of November, 1893, Paton, as such chairman, addressed to the trustee this letter:

"Seattle, Lake Shore & Eastern Railway Company, 80 Broadway, Room 145.

"New York, November 16, 1894.

"Union Trust Company of New York, Trustee, 80 Broadway, New York, N. Y.—Gentlemen: A committee of the first mortgage bond holders of the Seattle, Lake Shore & Eastern Railway Company, composed of Messrs. H. O. Armour, E. D. Christian, J. D. Smith, and M. S. Paton, has been organized, and the undersigned has been elected chairman of said committee. The said committee have deposited, subject to their order under the terms of a certain agreement, with the Manhattan Trust Company of New York $4,410,000 of said first mortgage bonds of said railway company, being over four-fifths of the total outstanding bonds. The committee hereby, under a resolution passed the 9th day of November, 1893, requests you to proceed forthwith to the foreclosure of said mortgage for the interest past due and unpaid. The committee does not desire at the present time to declare the principal of said mortgage due, but request that the papers may be drawn on the lines as above indicated, namely unpaid interest. We further request you to demand in the bill of foreclosure above referred to the appointment of receiver to represent the interests of the bond holders and yourself as trustee.

"Very truly yours,          Morton S. Paton, Chairman."

As printed in the record, the date of this letter is November 16, 1894, which date, as asserted by counsel for the appellee, and which is evident from other parts of the record, particularly the findings and decree, is incorrect; the true date of the letter being November 16, 1893. It was pursuant to that request that the original bill, after notice to the defendant railway company, was allowed by the court below to be filed, and was filed December 23, 1893. In the bill as so filed it was alleged, among other things, that the railway company made default in the payment of the semiannual interest due and payable upon the bonds secured by the mortgage, and each of them, on August 1, 1893, after demand therefor duly made. The original bill

also contained the allegation "that it is essential to the preservation of the rights of your orator, and of all said bondholders, that the income yielded by said mortgaged premises be at once sequestrated and applied towards the reduction of the amounts due and to become due on said bonds." The prayer of the bill was for an accounting and ascertaining of the amount due and unpaid for interest on the outstanding bonds, and that the payment thereof be decreed; and for the ascertaining of what amount is due and payable to the sinking fund, and that payment thereof be decreed; and for the ascertaining of the amount due for taxes and other prior liens, and for allowances for costs of suit and attorney's fees, and that the payment thereof be decreed; and that, in default of such payments within a reasonable time, to be fixed by the court, the mortgaged premises be decreed to be sold, and the proceeds, after the discharge of the prior liens and costs and attorney's fees, be applied to the payment of interest due on the outstanding bonds and to the payment of the amount due to the sinking fund. The prayer also asked for the appointment of a receiver of the property, which appointment the court subsequently made.

To the original bill the defendant railway company entered its general appearance July 2, 1894. On the 28th day of July, 1894, the trust company addressed and sent to the railway company this letter:

"New York, July 28, 1894.

"Seattle, Lake Shore & Eastern Railway Co., Mills Building, New York City—Gentlemen: Default having been made by you in the payment of certain coupons annexed to the bonds secured by mortgage dated August 10th, 1886, and executed by you to us as trustee, which coupons matured August 1st, 1893, and default having been made by you in the payment of the amount required to be paid on August 1st, 1893, into the sinking fund to be created pursuant to the provisions of said mortgage, we hereby elect to declare, and do now declare, the principal of all of said bonds now outstanding as due and payable.

"Yours, respectfully,

"Union Trust Company of New York, by Jas. H. Ogilvie, V. Pr."

On the 2d day of August, 1894, the complainant made a motion in the court below for leave to file an amended bill, a copy of which was on the same day served upon the solicitors for the defendant railway company. The motion was granted by the court, and an amended bill filed, which alleged, among other things, that in and by the mortgage—

"It was further provided that, in case default should be made at any time in the payment of any installment of interest on any of the bonds thereby secured, the payment thereof having been duly demanded, the coupons therefor having been duly presented at the said time and place named therefor, and if any such default should continue for a period of six months, then and in such case the principal of all of said bonds secured by said mortgage should, at the election of the said trustee, become and be immediately due and payable, anything in the said bonds or in the said mortgage contained to the contrary notwithstanding."

The amended bill also alleged that the defendant railway company had made default in the payment of the semiannual interest due and payable on the bonds, and each of them, on the 1st day of August, 1893, and on the 1st day of February, 1894, respectively, due demand therefor having been made, and the coupons therefor having been duly presented, and had also made other defaults in failing to comply with

the conditions of the mortgage, by reason of which the complainant had, on or about July 20, 1894, elected to declare, and did declare, the principal of all of the bonds secured by the mortgage to be immediately due and payable. Subsequent amendments to the bill were by leave of the court filed by the complainant, and on October 2, 1894, this stipulation was entered into and filed by the respective parties, through their solicitors:

"It is hereby stipulated by and between the parties hereto that the above-named respondent shall have until Monday, the 15th day of October, 1894, to file its answer to the complainant's bill of complaint and amendments thereto filed herein, and that, in the case of a default by said respondent to file its answer on the merits on or before the time above designated, the said complainant shall take and enter the default of the said respondent herein as for want of an answer, and proceed immediately to apply to the court for the relief demanded in its bill of complaint and amendments thereto; the right to file any plea or demurrer, except an answer to the merits, being hereby expressly waived by the respondent, in consideration of the extension for leave to file such pleading."

The defendant railway company, on the 15th day of October, 1894, answered to the merits, to which answer exceptions were filed by the complainant and sustained by the court. On the 25th day of January, 1895, the defendant railway company filed an amended and plea, duly verified by its vice president, which plea was, on the 11th day of February, 1895, set down for argument upon the ground of its insufficiency, and which plea, after argument, was by the court overruled February 18, 1895. On the 24th day of May, 1895, leave was given the defendant railway company to file a second amended answer, which it did on the same day, and which was duly verified by the vice president of the company. To that second amended answer the complainant filed exceptions on the 24th of May, 1895, for impertinence, and the matters so excepted to were subsequently expunged by order of the court. No other amendment to the answer being made, and the cause being at issue, the same was referred, on the 14th day of June, 1895, to the master. Among the issues raised by the pleadings, and so referred to the master, was one as to the amount due upon the outstanding bonds secured by the mortgage; and the master was also directed, among other things, to ascertain and report all of the property upon which the mortgage was a lien, and to ascertain and report whether the mortgaged property could be advantageously sold in separate parcels, or whether the same should be sold as an entirety. Upon the taking of the proof before the master both parties to the suit were represented by their solicitors, and there this stipulation in writing was entered into by the respective parties:

"First. That Exhibit No. 4, hereto attached, together with schedules, marked 'A,' 'B,' 'C,' 'D,' 'E,' and 'F,' annexed to said exhibit, contains a correct description of the mortgaged premises, with the appurtenances, rights, and franchises thereunto belonging, as set forth in the bill of complaint and mortgage therein set forth; and that all the property, of every kind and description, mentioned, set forth, described, or referred to in said Exhibit No. ——, and in any of the said schedules, are embraced within and covered by the lien of said mortgage above referred to.

"Second. That none of the property embraced within and covered by the lien of said mortgage, and hereinbefore referred to, can be advantageously sold in

separate parcels under any decree of foreclosure that may be rendered in said cause by said court, but that the same should be sold as an entirety.

"Third. That the expenses of said complainant, trustee, in and about the execution of its said trust, aggregate the sum of sixty-seven and $^{17}/_{100}$ ($67.17) dollars, as per detailed statement this day filed with Eben Smith, Esq., master in chancery of said court, to whom this cause has been referred.

"Fourth. That the reasonable fees and compensation of Struve, Allen, Hughes & McMicken, solicitors and of counsel for said complainant and trustee, may be fixed and determined by this court upon the coming in of the report in this cause by said master, and upon the hearing of the same, and that either party, with the consent of said court, may introduce proof as to the value of such reasonable fees and compensation, and proof as to any additional services rendered after the date hereof.

"Dated at Seattle this 25th day of September, 1895."

In Schedule E, referred to in this stipulation, is embraced 2,500 shares of the capital stock of the Union Depot Company of Spokane Falls. The Union Depot Company of Spokane Falls is a corporation organized and existing under the laws of the territory (now state) of Washington, having its office and principal place of business at the city of Spokane Falls, in that state, and was organized for the purpose, among other purposes, of acquiring, by purchase, donation, lease, or otherwise, lands in Spokane county, and to contract for the construction of, and to construct, railway passenger depots, freight depots, warehouses, roundhouses, machine shops, cattle yards, grain elevators, side tracks, and storage tracks, and any and all buildings or structures useful, necessary, or convenient for railway terminals, and to carry on and conduct the business of a railway terminal company, and to provide railway terminal facilities at or near the city of Spokane Falls, in the territory (now state) of Washington, and to charge reasonable compensation therefor, and to acquire, by purchase, lease, or otherwise, warehouses, storehouses, elevators, and other structures, and to sell, lease, or otherwise dispose of any structures or buildings owned or controlled by it. With the Seattle, Lake Shore & Eastern Railway Company and the Washington & Idaho Railroad Company, the Union Depot Company of Spokane Falls entered into, on the 14th day of October, 1889, a lease, by which the Union Depot Company undertook to construct and maintain, on lands which it had acquired and then owned, and which are specifically described in the lease, for the use in common by the two railway companies mentioned, and their successors and assigns, all necessary depots and other terminal facilities at the city of Spokane Falls, for certain considerations and upon certain terms and conditions in the lease mentioned.

On the 3d day of October, 1895, the master filed his report, to which no objections or exceptions were filed by the defendant railway company, and on the 22d day of November, 1895, the report coming on to be heard, both parties being represented by their solicitors, it was by the court in all things confirmed. The report showed, among other things, the number of outstanding bonds to be 5,558, and the amount of principal and interest due and unpaid thereon to be $6,446,980. A decree and order of sale followed for that sum, together with costs and attorney's fees, to procure the reversal of which the present appeal was brought.

In support of the appeal the counsel for the appellant make four points:    (1) That the court below erred in finding and decreeing that the principal of all of the outstanding bonds became due and payable in July, 1894, by virtue of the declaration of the complainant; (2) that it erred in decreeing that the defendant railway company pay, within a certain time stated, the principal of all the outstanding bonds, as well as the interest due thereon, as a condition by which to avoid a sale of the mortgaged property; (3) that the court below erred in providing in the decree for a deficiency judgment in favor of the complainant and against the defendant railway company; (4) that it erred by including in the property decreed to be sold 2,500 shares of the capital stock of the Union Depot Company of Spokane Falls.

The assignments of error by which the appellant seeks to present these points are as follows:

"(8) The court erred in holding that complainant herein did, on the 30th day of July, 1894, elect to declare, and did declare and elect, the principal of all outstanding bonds secured by said mortgage to become immediately due and payable, pursuant to the provisions of said mortgage.

"(9) The court erred in finding, in and by said decree, that $5,558,000 was the total principal due on said outstanding bonds at the date of the rendition of the decree."

"(12) The court erred in ordering, adjudging, and decreeing herein that this defendant pay or cause to be paid to the complainant, on or before the 3d day of February, 1896, the sum of $5,558,000, together with the interest found to be due by the terms of said decree, as hereinbefore stated."

"(17) The court erred in ordering, adjudging, and decreeing herein that this defendant is personally liable for, and shall pay to the complainant, the amount of any deficiency, with interest thereon, which may remain due after the sale of the properties of this defendant under the terms of said mortgage, and the application of the proceeds thereof, pursuant to the terms of said decree."

"(23) The court particularly erred in ordering, adjudging, and decreeing that 2,500 shares of the capital stock of the Union Depot Company of Spokane Falls, Washington, and a certain leasehold estate for the period of 99 years in and to said property leased by said depot company to this defendant, in and near the city of Spokane, in the state of Washington, were covered by the terms of and included within the said mortgage, and in directing said property to be sold, along with the other properties mentioned in said decree, to satisfy the amounts by said decree found to be due upon said mortgage.

"(24) The court erred in ordering, adjudging, and decreeing that the mortgage mentioned and set forth in the bill of complaint herein should be foreclosed, and the properties described therein and covered thereby sold to satisfy the amounts of principal and interest found to be due upon the bonds secured by said mortgage according to the terms of said decree."

Passing the question of the sufficiency of these assignments, we think it clear that the appellant's points 1, 2, and 3 are not well taken. Points 1 and 2 may be considered and disposed of together.    They relate to the inclusion by the court below in its decree of the principal sums of the outstanding bonds.    Undoubtedly, if the principal sums were not due at the time of the trial and judgment, their inclusion would constitute such error as would make it necessary to reverse the entire decree; for, as said by the supreme court in Railroad Co. v. Fosdick, 106 U. S. 47, 71, 1 Sup. Ct. 10:

"It is obvious that the finding of the amount due, for nonpayment of which, according to the terms of the decree, the mortgaged property is ordered to be sold, is the foundation of the right of the mortgagee further to proceed, and a substantial error in that finding must, on appeal, vitiate all subsequent proceed-

ings. Unlike a calculable error in the amount of a personal judgment, which may be cured by a remittitur, it is otherwise incurable; for, as it is an illegal exaction, made as a condition for preserving the rights of the mortgagor in his estate, and, if executed, depriving him wrongfully of them, it propagates itself through all subsequent stages of the cause."

It is true, as stated by counsel for the appellant, that by the terms of the mortgage a majority in interest of the bondholders had control of the action of the trustee respecting its election to declare the principal of the bonds due by reason of default on the part of the mortgagor; for the mortgage in terms authorized the majority in interest of the bondholders to waive the right of election, and to annul or reverse the election of the trustee when exercised. But, in saying that the committee of the bondholders, through its chairman, after the action of the trustee in declaring the principal sums of the outstanding bonds due, and before the case was at issue in the court below, annulled that action of the trustee, the counsel for the appellant make a mistake of fact. The basis of that statement by the appellant's counsel is the letter from the chairman of the committee of bondholders to the complainant, appearing in the record as of date November 16, 1894, by which the trustee was requested "to proceed forthwith to the foreclosure of said mortgage for the interest past due and unpaid," and in which the trustee was informed that "the committee does not desire, at the present time, to declare the principal of said mortgage due, but request that the papers may be drawn on the lines as above indicated, namely, unpaid interest." The findings of the master, to which no objections or exceptions were taken by the appellant, as well as the findings and decree of the court, show that the original bill, which was filed December 23, 1893, was filed pursuant to that request of the committee of the bondholders. That letter, therefore, must have been written prior to December 23, 1893. Its date appearing in the record—November 16, 1894—was, therefore, evidently a mistake, the year 1894 being, as stated by counsel for the appellee, erroneously given instead of 1893. Besides, there is in that letter nothing whatever to indicate any reversal or annulment by the majority in interest of the bondholders of any action of the trustee in declaring the principal sums of the bonds due, and nothing to indicate that any such election had been made by the trustee; but, on the contrary, it plainly shows upon its face, as do the findings of the master, and the findings and decree of the court below, that that letter was the first step taken looking to the foreclosure of the mortgage in question. Nearly one year thereafter, and after the defendant railway company had entered its general appearance to the original bill, to wit, on the 28th day of July, 1894, the complainant did exercise its election, and did declare the principal sums of all the outstanding bonds due and payable because of the default on the part of the defendant railway company in the payment of the coupons annexed to the bonds maturing August 1, 1893, and of its default in the payment of the amount required to be paid August 1, 1893, into the sinking fund to be created pursuant to the provisions of the mortgage. So far as the record shows, that was the only election ever made by the trustee, and with it there was no interference on the part of the majority in interest of the

bondholders at any time, so far as appears; nor does it appear that the majority in interest of the bondholders ever waived such election on the part of the trustee.

It is, however, further insisted on the part of the appellant that the election made by the complainant, after the commencement of the suit and during its pendency, declaring the principal sums of the outstanding bonds due, constituted subject-matter for a new suit, and made a new case which could not be properly brought into the original suit by amended bill, and, furthermore, that if it could, such amended bill required the issuance of another subpœna, without the issuance of which the appearance of counsel thereto for the defendant was without effect. The sole office of the writ of subpœna is to bring the defendant into court in order that the court may acquire jurisdiction over his person. "A general appearance," said the supreme court in Creighton v. Kerr, 20 Wall. 8, 12, "waives all question of the service of process. It is equivalent to a personal service." The record shows that in this cause the defendant stipulated by its solicitor to file an answer to the amended bill upon the merits, in consideration of an extension of time given it for that purpose, and in pursuance of that stipulation did afterwards file such an answer to the amended bill, duly verified by its vice president. It thus voluntarily submitted itself to the jurisdiction of the court, which was a waiver of the service of process having for its object the bringing of the defendant into court. The new matter brought into the suit by the amended bill was the election exercised by the complainant declaring the principal sums of the outstanding bonds immediately due and payable. This was properly the subject of a supplemental bill; but, where such matter is introduced into the suit by amendment to the original bill, objection must be made by demurrer, plea, or answer; otherwise, it is waived. Fost. Fed. Prac. (2d Ed.) § 165; Brown v. Higden, 1 Atk. 291; Archbishop of York v. Stapleton, 2 Atk. 136; Wray v. Hutchinson, 2 Mylne & K. 235. In this case no such objection was taken. On the contrary, the parties stipulated in writing, whereby, in consideration of an extension of time within which to plead, the defendant railway company expressly waived the right to file any plea or demurrer, but agreed to file an answer to the merits, which it afterwards did, duly verified by its vice president.

The third point made on behalf of the appellant is answered by the ninety-second equity rule prescribed by the supreme court for the government of the courts of equity of the United States. It is as follows:

"In suits in equity for the foreclosure of mortgages in the circuit courts of the United States, or in any court of the territories having jurisdiction of the same, a decree may be rendered for any balance that may be found due to the complainant over and above the proceeds of the sale or sales, and execution may issue for the collection of the same, as is provided in the eighth rule of this court regulating the equity practice, where the decree is solely for the payment of money." Insurance Co. v. Keith, 23 C. C. A. 196, 77 Fed. 374.

By the terms of the decree appealed from, the deficiency judgment provided for is not for the benefit of the complainant, but is in favor of the complainant as trustee. The amount of such deficiency, like the amount realized by the sale of the mortgaged property, after de-

ducting costs et cetera, is to be paid to the bondholders according to their respective interests. A special prayer for a judgment for such deficiency as may be found to exist, while proper and the better practice, is not absolutely essential. Under the prayer for general relief, which the amended bill contained, such judgment may be given. Story, Eq. Pl., §§ 40, 41; 1 Pom. Eq. Jur. 161; Tayloe v. Insurance Co., 9 How. 406; Jones v. Van Doren, 130 U. S. 684, 9 Sup. Ct. 685.

Nor did the court below err in including in its decree of sale the 2,500 shares of the capital stock of the Union Depot Company of Spokane Falls. It is true that that company was an independent corporation, organized and existing under and by virtue of the laws of the state of Washington; and that the ownership of a portion of its stock by the defendant railway company did not and could not confer upon the latter any power to mortgage the property of the depot company. Humphreys v. McKissock, 140 U. S. 304, 312, 11 Sup. Ct. 779. But, while the agreement of lease entered into between the Union Depot Company and the Seattle, Lake Shore & Eastern Railway Company and the Washington & Idaho Railroad Company, embodied in the report of the master, shows that the Union Depot was erected upon property belonging to the Union Depot Company, the complainant, but for the stipulation entered into by counsel for the respective parties, might have been able to show by proof that the Union Depot Company acquired the land upon which the Union Depot was erected from the defendant railway company, in consideration of the 2,500 shares of the capital stock of the depot company, and that at the time of such acquisition the land was subject to the complainant's mortgage. Under such circumstances, the stock representing the interest of the defendant railway company in the depot used in connection with its road might be covered by the complainant's mortgage, and, since it is possible that such proof might have been made by the complainant, the stipulation of counsel, entered into before the master, to the effect that the 2,500 shares of the capital stock of the depot company were covered by the mortgage to the complainant, must be held conclusive of the fact upon the parties.

In speaking of the binding character upon parties of stipulations between their counsel, in regard to proof, Chief Justice Shaw, in the case of Lewis v. Sumner, 13 Metc. (Mass.) 269, said:

"The importance of upholding agreements and concessions, like the present, between attorneys and counsel of litigating parties, is greater than it might seem at first blush, and is enhanced by our present practice. In most cases of controverted facts, many facts are embraced in the issue which are not really in dispute between the parties; but each must be prepared to prove all the facts necessary to his own case unless he can previously obtain a concession from the adverse party in a form which he can rely upon at the trial. It is, therefore, a wise, useful, and beneficial practice, resorted to by those who are most careful in preparing causes for trial, and a practice well deserving to be encouraged by the courts, for the parties, by their attorneys, to obtain and give mutual concessions, in writing, of all the material facts not intended to be controverted, and so narrow the litigation to the precise matters in controversy. It saves expense, avoids surprise and delay, and often prevents the loss of a good cause, by an unexpected call for proof, which could easily have been obtained if it had been anticipated that such fact would be called in question. This practice of admitting facts is the more necessary, since the disuse of special pleadings, which was designed, and to some extent had the ef-

fect, to narrow the issue on record to some one or a few questions of fact. This consideration renders it important to hold that a litigant party shall not be permitted to deny the authority of his attorney of record while he stands as such on the docket. He may revoke his attorney's authority, and give notice of it to the court and to the adverse party; but, while he so stands, the party must be bound by the acts of the attorney."

The shares of stock in the Union Depot Company being thus stipulated to be covered by the mortgage were, like all the other property covered by it, embraced by the complainant's bill. Besides, no objection was at any time made in the court below to the bill upon the ground that the allegations were not broad enough to embrace the shares of stock in question; nor was that objection made in any assignment of error. The judgment is affirmed, with costs.